GIRARD BANK

v.

JOHN HANCOCK MUTUAL LIFE IN-SURANCE COMPANY and Connecticut General Life Insurance Company.

Civ. A. No. 79-4676.

United States District Court, E. D. Pennsylvania.

Sept. 1, 1981.

Arthur E. Newbold, IV, Amy B. Ginensky, Philadelphia, Pa., for plaintiff.

E. Barclay Cale, Jr., Jacqueline V. Prior, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

In this diversity action, Girard Bank ("Girard") brought suit seeking specific performance of an agreement by John Hancock Mutual Life Insurance Company ("John Hancock") and Connecticut General Life Insurance Company ("Connecticut General") to pay $6,494,200.00 to Girard in exchange for certain Conditional Sale Agreements and security interests in railroad boxcars. John Hancock and Connecticut General counterclaimed, seeking rescission for three earlier transactions in which a total of $14,690,000.00 was paid to Girard in exchange for other Conditional Sale Agreements and security interests in railroad boxcars.[1] Following a jury trial on the issues of liability on both the claim and

---

1. It was agreed by both parties that Pennsylvania law governs in this diversity action as provided in Section 15 of the Participation Agreement and Article 21 of the Conditional Sale Agreements.

counterclaim, the jury, in its answers to special interrogatories submitted by the Court, returned a verdict in favor of Girard on both claims.[2] Presently before the Court are defendants' motions for judgment n.o.v. and/or new trial with respect to plaintiff's claim and defendants' motion for a new trial on the counterclaim. Also before the Court are plaintiff's proposed decree for specific performance and plaintiff's motion for prejudgment interest. For the reasons which follow, defendants' motions are denied, the proposed decree is adopted, and plaintiff's motion for prejudgment interest is granted at the legal rate of six percent per annum.

## I. *Facts*

On August 16, 1979, John Hancock and Connecticut General (hereinafter "Insurance Companies") entered into a Participation Agreement with National Railway Utilization Corporation ("NRUC") and Pickens Railroad Company ("Pickens"), an affiliate of NRUC, to loan $39,000,000.00 to NRUC for the purchase of railroad boxcars from boxcar manufacturers.[3] NRUC was engaged in the business of assembling and selling boxcars to private investors, managing railroad boxcars owned by third parties, and renting railroad boxcars to operating railroads across the United States. Under the Agreement, both Insurance Companies agreed to finance 80% of the purchase price of the boxcars and NRUC agreed to pay the remaining 20% balance. The loan agreement provided for an 11⅜% annual interest rate, provided that the total amount of indebtedness be repaid within fourteen years.

Under the Participation Agreement and the accompanying Conditional Sale Agree-ments, which covered the separate lots of newly manufactured boxcars, it was provided that the boxcar security interests would be reassigned to the Insurance Companies as security for the $30 million loan. NRUC also agreed, as additional security, to execute and deliver to the Insurance Companies certain Stock Purchase Warrants which entitled the holder to purchase, at its option, common stock of NRUC at $22.00 per share.

The Agreement provided that the monies would be loaned in separate installments at different individual closing dates, all of which were to be completed no later than March 31, 1980. One of the terms of the Agreement was that the funds would only be advanced in minimum closing amounts within a 5% range of $5 million. In order that NRUC would be able to take delivery of the completed boxcars in lots less than 150 boxcars (each boxcar cost approximately $40,000.00), the Participation Agreement provided for an "Interim Lender" to make the initial payments to the manufacturers at "Interim Closings" and later reassign the Conditional Sale Agreements and security interests to the Insurance Companies at "Reassignment Closings," in exchange for the repayment of the monies extended by the Interim Lender. Girard was selected by NRUC as the "Interim Lender" during the negotiations between NRUC and the Insurance Companies and prior to the final preparation and formal execution of the Participation Agreement. Girard's name was also inserted in the Conditional Sale Agreements and other contractual documents accompanying the Participation Agreement. In return for this interim lending service, NRUC agreed to pay Girard 110% of its

---

**2.** The jury returned a verdict in favor of plaintiff Girard on both Count I ($4,874,800.00) and Count II ($1,619,400.00) of the Amended Complaint. The Court directed a verdict against defendants John Hancock and Connecticut General on Count I ($4,908,000.00) and partially on Count II ($3,272,000.00) of the Amended Counterclaim. The jury found against the defendant Insurance Companies on Count II ($1,636,000.00) and Count III ($4,874,800.00) of the Amended Counterclaim.

**3.** The Participation Agreement provided that Connecticut General would advance up to $20,-000,000.00 and John Hancock up to $10,000,-000.00 to finance the purchase of the boxcars by NRUC. Connecticut Bank and Trust Company served as the banking agent for the Insurance Companies under the Participation Agreement. The boxcar manufacturers included Whittaker Corporation (Berwick Forge & Fabricating Division) and Evans Transportation Company (Southern Iron & Equipment Company Division).

prime interest rate on any indebtedness outstanding to Girard during this interim lending period. It was also agreed that Girard would receive a rate four percentage points above its prime rate on any amounts remaining unpaid after they became due and payable. Article 23, Conditional Sale Agreement.

The first "Interim Closing" was held on August 17, 1979. At this closing, Girard advanced $2,454,000.00 to NRUC for the purchase of a lot of 75 boxcars from the boxcar manufacturers under a separately executed Conditional Sale Agreement. Both Girard and the boxcar manufacturers also executed an Agreement and Assignment which assigned the manufacturers' security interest in the boxcars to Girard. On August 28, 1979, $2,454,000.00 was extended at the second "Interim Closing."

The first "Reassignment Closing" was held on September 12, 1979, between the Insurance Companies and Girard. On that date, as expected, both parties executed a Further Assignment and Agreement which assigned the Conditional Sale Agreements and boxcar security interests (acquired earlier by Girard at the "Interim Closings") to the Insurance Companies in exchange for the $4,908,000.00 previously extended by Girard. Subsequent "Interim Closings" were held during September, October and November, 1979. "Reassignment Closings" were also held on November 2, 1979, for $4,908,000.00 and November 16, 1979, for $4,874,800.00.

The following events led to this lawsuit. On December 3, 1979, a "Reassignment Closing" was scheduled, at which Girard was to be paid $4,874,800.00—the amount of monies extended by Girard at "Interim Closings" on November 8, 1979 ($1,619,-400.00); November 15, 1979 ($1,619,400.00); and November 27, 1979 ($1,636,000.00). This closing was postponed by the Insurance Companies to December 11, 1979. On that date, Girard tendered the necessary documents, but the Insurance Companies refused to pay. Girard filed suit for the $4,874,800.00 and the additional amount of $1,619,400.00 paid under a separate Condi-

tional Sale Agreement acquired at the second "Interim Closing" on November 27, 1979. The Insurance Companies, in their answer, defended their refusal to pay the amounts claimed and, in addition, counterclaimed for rescission of the three earlier "Reassignment Closings."

## II.  *Motion for Judgment N.O.V.*

■  Defendant Insurance Companies move the Court, pursuant to Fed.R.Civ.P. 50(b), for a judgment n.o.v. with respect to Girard's claim. To grant a motion for judgment n.o.v., the Court must find, as a matter of law, that the plaintiff failed to present sufficient evidence to justify the verdict. *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1210 (3d Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Such a motion "may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." 5A *Moore's Federal Practice* ¶ 50.07[2] at 50–77 (2d ed. 1974).

## A.  *Standing*

■  The Insurance Companies contend that Girard has failed to establish, by sufficient evidence, that it has standing to enforce the Participation Agreement as either a direct party or third-party beneficiary under the Agreement. Paragraph 7 of the Participation Agreement specifically provides that the Insurance Companies would pay "to the Builder, or the Interim Lender, as the case may be, . . . an amount equal to the Conditional Sale Indebtedness . . . ." Although the Participation Agreement did not specifically mention Girard as a formal party to the lending arrangement, it still provided for an "Interim Lender" and Girard's name was inserted in the contractual documents accompanying the Participation Agreement, the Conditional Sale Agreement, Agreement and Assignment, and Further Assignment and Agreement. In each of the above-mentioned documents, it was provided that it was "contemplated" that Girard would reassign the Conditional Sale Agreements and boxcar security inter-

ests to the Insurance Companies in return for the repayment of the monies extended by Girard. Girard was both chosen and consulted during the negotiations between NRUC and the Insurance Companies with respect to its role as "Interim Lender" both prior to and after the formal execution of the Participation Agreement.

■■■ The course of dealings and conduct of both Girard and the Insurance Companies plainly evidence a contractual relationship between these parties. The Court firmly believes that the intent of the parties to undertake this contractual relationship can be ascertained from the "contemplation" language found in the Participation Agreement and accompanying documents. *Von Lange v. Morrison-Knudsen Co.*, 460 F.Supp. 643, 647–49 (M.D.Pa.), *affirmed*, 609 F.2d 504 (3d Cir. 1978). Even if such evidence were insufficient to establish the existence of an express agreement between Girard and the Insurance Companies, the course of dealings and conduct of both parties clearly establish the existence of an implied-in-fact contract. *Elias v. Elias*, 428 Pa. 159, 237 A.2d 215, 217 (1968). At a minimum, Girard is a third-party beneficiary under the Participation Agreement. *See In re Gebco Investment Corp.*, 641 F.2d 143, 146–47 (3d Cir. 1981).

B. *Conditions Precedent for December 11, 1979 Reassignment Closing*

■ The Insurance Companies contend that Girard had failed to sufficiently establish that all conditions precedent to the Insurance Companies' obligation to accept the reassignment of the November Conditional Sale Agreements had been satisfied. The final paragraph of Section 6 of the Participation Agreement lists the conditions precedent to the Insurance Companies' obligation to pay the "Interim Lender" (i. e. Girard) the amounts of monies extended at "Interim Closings." The Court finds that there is sufficient evidence that all of the necessary documents specified in the last paragraph of Section 6 were received by Girard and that Girard was ready, willing and able to forward these documents to the

Insurance Companies at the rescheduled December 11, 1979 "Reassignment Closing." The Insurance Companies nevertheless contend that even if Girard were able to produce the required documents, Girard had failed to sufficiently show that the documents were both truthful and accurate with respect to their contents. However, Section 9 of the Agreement and Assignment specifically provides that the reassignment of any documents acquired by Girard at the "Interim Closings" would be made "without any representation or warranty." Furthermore, Girard's only obligation with respect to these documents was contained in Section 5(c) of the Further Assignment and Agreement in which Girard warranted that "to the best of its knowledge, no event of default has occurred under the Conditional Sale Agreement." Accordingly, this defense is not applicable. Girard has clearly demonstrated that all conditions precedent to the obligation of the Insurance Companies to pay Girard had been satisfied.

C. *Conditions Precedent for Payment of the Additional $1,619,400.00*

■ The Insurance Companies contend that Girard failed to establish that Girard had sufficiently satisfied all the conditions precedent necessary for reimbursement of the second November 27, 1979, interim payment of $1,619,400.00. Essentially, the Insurance Companies contend that Girard had failed to tender the required documents and had also failed to extend further monies to NRUC in order to reach the minimum closing amount within a 5% range of $5 million which was necessary for repayment. This argument, however, is completely without merit. "Interim Closings" were scheduled for December 6, 1979 and December 13, 1979. The Insurance Companies, however, notified Girard that the December 3, 1979 "Reassignment Closing" would be postponed and therefore, put Girard on notice that the Insurance Companies might not perform. Girard, after being informed that the Insurance Companies would no longer lend any money to NRUC, correctly refused to make further payments under the sched-

uled "Interim Closings." (N.T. 1.98). Secondly, the Insurance Companies refused to pay Girard at the rescheduled "Reassignment Closing" on December 11, 1979. (N.T. 4.162). Therefore, the conduct of the Insurance Companies amounted to an anticipatory breach of the Agreement with Girard. Thus, Girard was excused from further performance at the December 6, 1979 and December 13, 1979 scheduled "Interim Closings." *William B. Tanner Co., Inc. v. WIOO, Inc.*, 528 F.2d 262, 268–71 (3d Cir. 1975); *Wolgin v. Atlas United Financial Corp.*, 397 F.Supp. 1003, 1014 (E.D.Pa.1975), *affirmed, Blumenfeld v. Atlas United Financial Corp.*, 530 F.2d 963 and 530 F.2d 966 (3d Cir. 1976).

## D. *Revolving Credit Arrangement*

██ The Insurance Companies contend that a revolving credit arrangement entered into between Girard and NRUC constituted "senior debt" in violation of Section 9 of the Participation Agreement. Briefly stated, Girard advanced $4,000,000.00 to NRUC on August 30, 1979, which was repaid on September 10, 1979, and advanced an additional $2,223,000.00 to NRUC on September 11, 1979, repaid on September 25, 1979. Each of these loans was made and repaid, respectively, within a two week period. This revolving credit arrangement between Girard and NRUC, as a matter of law, cannot excuse the Insurance Companies' obligation to perform. The record clearly indicates that this short-term credit arrangement did not prejudice the interests of the Insurance Companies under the long-term financing arrangement with NRUC. (N.T. 4.166–4.167). Indeed, the revolving credit was helpful because it aided in alleviating a short-term cash flow problem incurred by NRUC during September, 1979. Even if these short-term loans amounted to a breach of the Participation Agreement as "senior debt," the breach was so insubstantial that, as a matter of law, it would not relieve the Insurance Companies of their obligation to repay Girard at the future "Reassignment Closings." 6 *Corbin on Contracts* § 1253, at 13 (1962).

The Insurance Companies further contend that other revolving credit arrangements, entered into by NRUC with South Carolina National Bank in August, 1979, and with United States Trust Company in October, 1979, were also incurrences of "senior debt" in violation of the Participation Agreement. These credit arrangements, however, cannot excuse the performance owed to Girard because of the fact that the Insurance Companies knew of these arrangements, failed to formally object, and therefore, are now estopped to raise such a defense with respect to Girard. (N.T. 3.10–3.14; 3.121–3.122; 5.46–5.47).

## E. *Events of Default*

██ The Insurance Companies contend that Girard did not sufficiently establish that no events of default had occurred under the November 8, 15 and 27, 1979 Conditional Sale Agreements. In a contract action, the plaintiff has the burden of proof to show that there was a contract, that all conditions precedent for performance were satisfied, and that the defendant breached the agreement. *See Mellon Bank, N.A. v. Aetna Business Credit*, 619 F.2d 1001, 1007–08 (3d Cir. 1980); 5A *Corbin on Contracts* § 1228, at 507–08 (1964). The only conditions precedent to the Insurance Companies' obligation was the receipt of the documents specified in the final paragraph of Section 6 of the Participation Agreement and not the fact that there "was no default." Section 7 of the Participation Agreement provides that "the Agent will pay to the Builder, or to the Interim Lender, as the case may be, in accordance with the Assignment or the reassignment thereof (*and subject to the conditions specified in Section 4 thereof*) out of moneys so paid to the Agent, an amount equal to the Conditional Sale Indebtedness . . . ." (emphasis added). Section 4(ii) of the Agreement and Assignment provides that "[t]he obligation of the Assignee [Girard] . . . to make payment for any of the Equipment assigned hereunder is hereby expressly conditioned . . . (ii) upon no event having occurred of the type specified in clause (ii) of Section 2 hereof [event which with the

lapse of time and/or demand, could constitute an event of default] . . . ." This provision was inserted to protect Girard as "Assignee," and not the Insurance Companies. The provision in Section 7 of the Participation Agreement—"(and subject to the conditions specified in Section 4 thereof)"—must be read within the context of the entire Agreement. *Robert F. Felte, Inc. v. White,* 451 Pa. 137, 302 A.2d 347, 351 (1973). The last paragraph in Section 6 expressly sets forth the conditions precedent for the payment of Girard. The general reference contained in Section 7, as emphasized above, cannot be interpreted as an express condition precedent to the Insurance Companies obligation to Girard. This provision was neither included in the list of condition precedents set forth in the last paragraph of Section 6, nor was it expressed in clear language as a condition precedent. *Mellon Bank, N.A. v. Aetna Business Credit,* 619 F.2d 1001, 1015–16 (3d Cir. 1980). Therefore, the assertion of a default, which would excuse the Insurance Companies' obligation to pay Girard, would constitute an affirmative defense. The Insurance Companies, thus, had the burden of showing any default which would excuse its performance to Girard. 3A *Corbin on Contracts* § 655, at 142–43 (1960).

### F. *Material Adverse Change*

The Insurance Companies contend that Girard did not sufficiently establish that no material adverse change had occurred as of November 8, 15 and 27, 1979, which, if in existence, would have rendered the Conditional Sale Agreements in default and excused the Insurance Companies' performance. Section 4(i) of the Participation Agreement provided that NRUC warranted that "[s]ince December 31, 1978, there have been no changes, except in the ordinary course of business, and there have been *no changes which* individually or in the aggregate have been *materially adverse* to the condition, financial or otherwise, of the Vendee (NRUC) as shown on the balance sheet as of such date." (emphasis added). Under the last paragraph of Section 6 of the Participation Agreement, a condition

precedent to the Insurance Companies' obligation to pay Girard, was the receipt of a certificate specified by the last paragraph of Section 4 of the Agreement and Assignment, containing the statement that there was no "event which, with the lapse of time and/or demand, could constitute . . . an event of default." *See* Section 4(ii), Agreement and Assignment; Section 2(ii), Agreement and Assignment; Article 15(d), Conditional Sale Agreement. A default could be declared if "any material representation or warranty of the Vendee [NRUC] . . . shall prove to be incorrect in any material respect on the date as of which made." Article 15(c), Conditional Sale Agreement.

At each "Interim Closing," NRUC certified that as of such date there was "no event which with the passage of time would place them in default under the aforementioned Conditional Sale Agreement" and that "[t]he representations and warranties of National Railway Utilization Corporation and Pickens Railroad Company contained in Section 7 of Article 23 of the aforementioned Conditional Sale Agreement [which referred to the material adverse change clause in Article 4(i) of Participation Agreement] are true and correct as of the date of this Certificate, with the same effect as if made on this date." *See, e. g.,* Plaintiff's Exhibit No. 16, Document # 2 (November 8, 1979 "Interim Closing"); Plaintiff's Exhibit No. 16, Document # 3 (November 15, 1979 "Interim Closing"); Plaintiff's Exhibit No. 17, Document # 3 (November 27, 1979 "Interim Closing"); Plaintiff's Exhibit No. 18, Document # 3 (November 27, 1979 "Interim Closing"). After receiving these documents, Girard tendered these certificates to the Insurance Companies at the "Reassignment Closings" as required under Section 6(ii) of the Participation Agreement. Because the absence of a material adverse change was not a condition precedent, the assertion that these certificates were false and that an event of default had occurred under the Conditional Sale Agreements would constitute an affirmative defense by the Insurance Companies to its obligation to pay Girard. 3A *Corbin on Contracts* § 655,

at 142–43 (1960). Therefore, the Insurance Companies carried the burden of showing whether an event of default had occurred under the Conditional Sale Agreements. *Mellon Bank, N.A. v. Aetna Business Credit,* 619 F.2d 1001, 1015–16 (3d Cir. 1980).

Testimony was presented by two expert witnesses on whether a material adverse change had occurred which constituted a default under the Conditional Sale Agreements transferred to Girard on the November 8, 15 and 27 "Interim Closings." The Court finds that there is sufficient evidence on the record, based on the testimony of Mr. Joseph Cappalonga and the evidence presented during the cross-examination of Mr. Barry Moore, to support the jury's finding that no material adverse change had occurred on November 8, 15 and 27, 1979.

G. *Third Quarter Compliance Certificate*

Finally, the Insurance Companies contend that the failure of NRUC to provide a Third Quarter Compliance Certificate to John Hancock and Connecticut General was an event of default under Section 10(a) of the Participation Agreement and Article 15(c) of the Conditional Sale Agreements which excused its performance to Girard. Briefly stated, NRUC had agreed, under the Participation Agreement, to provide a third quarter statement within forty-five days after the end of the third quarter. Under Article 15(c) of the Conditional Sale Agreement, a default would occur if NRUC "shall, for more than 30 days after the Vendor [Insurance Companies] shall have demanded in writing performance thereof, fail or refuse to comply with any other covenant, agreement, term or provision of this Agreement, or of the Participation Agreement, on its part to be kept and performed or to make provision satisfactory to the Vendor for such compliance."

■ The furnishment of a compliance certificate by NRUC was not a condition precedent to the Insurance Companies' obligation to pay Girard because it was not expressed in clear language as a condition precedent. Therefore, it must be construed as a promise or covenant. *Mellon Bank,*

*N.A. v. Aetna Business Credit,* 619 F.2d 1001, 1016 (3d Cir. 1980). Second, although the certificate was due on November 15, 1979, forty-five days after the end of the third quarter, the evidence clearly demonstrated that the issue of the compliance certificate was first raised at a meeting held on December 4, 1979 (N.T. 3.25; 5.42–5.45), and that a satisfactory compliance certificate was received by the Insurance Companies by the end of December. (N.T. 4.177–4.182). Therefore, the Court held at trial, and reaffirms herein, that the Insurance Companies could not rely on the lateness of the Third Quarter Compliance Certificate, as a matter of law, as a default which would excuse the performance owed to Girard. Finally, the conduct of the Insurance Companies clearly demonstrated a waiver that the certificate be produced on November 15, 1979. (N.T. 5.44–5.46; 4.170–4.171). Nevertheless, the certificate was produced within thirty days after a formal demand for its production and satisfactorily demonstrated that NRUC was in compliance with all of its financial covenants as of the end of the third quarter. (N.T. 4.182).

III. *Motion for New Trial*

■ Defendant Insurance Companies alternatively move the Court, pursuant to Fed.R.Civ.P. 59, for a new trial. Motions for a new trial may be granted where "the verdict is against the weight of the evidence, or that for other reasons the trial was not fair." 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2805, at 37 (1973).

■ The Court has reviewed the seventy-one contentions raised by defendants in support of its motion for a new trial and is satisfied that the verdict is not contrary to the weight of the evidence, and that the remaining allegations of error are without merit for the reasons stated in the preceding section and at trial.

IV. *Motion for New Trial on Counterclaim*

Defendant Insurance Companies move the Court, pursuant to Fed.R.Civ.P. 59, for

a new trial on the counterclaim. The same standard, articulated in Section III, applies here as well.

## A. Burden of Proof

The Insurance Companies alleged in the counterclaim that Girard had fraudulently induced the Insurance Companies to accept the Reassignment of the Conditional Sale Agreements, received by Girard at the "Interim Closings," by fraudulently representing that "to the best of its knowledge, no event of default had occurred under the Conditional Sale Agreement." *See* Further Assignment and Agreement, Section 5(c). Count I alleges that Girard had fraudulently represented at the September 12, 1979 "Reassignment Closing" that there was no event of default when Girard knew, in fact, that the revolving credit arrangement with NRUC was in violation of Section 9(a) of the Participation Agreement. Counts II and III allege that Girard had fraudulently represented at the November 2, 1979 and November 16, 1979 "Reassignment Closings," respectively, that there was no default when Girard knew, in fact, that NRUC's representation with respect to a material adverse change was false.

■ Under Pennsylvania law, the burden of proof in an action for fraud is that of proof which is "clear, precise and indubitable." *Kaufman v. Mellon National Bank and Trust Co.,* 366 F.2d 326, 330 (3d Cir. 1966). The proponent must show by such proof that a material representation was made, that the representation was known to be false, that the maker intended that the representation be relied upon to the listener's detriment, that there was, in fact, justifiable reliance, and that damages resulted. *Edelson v. Bernstein,* 382 Pa. 392, 115 A.2d 382, 383 (1955).

## B. Revolving Credit Arrangement

■ The evidence presented by defendants was insufficient, as a matter of law, to support a finding that Girard fraudulently represented that there was no default when it, in fact, knew that the revolving credit arrangements with NRUC were in violation of the Participation Agreement. In addition to the reasons stated in Section III, Subsection D, there is insufficient evidence that Girard knew that the revolving credit arrangement violated the Agreement. Secondly, there is no evidence of any detrimental reliance by the Insurance Companies respecting Girard's representation. Thirdly, there is insufficient evidence that the revolving credit arrangement constituted "senior debt." Finally, the evidence demonstrated that the revolving credit arrangement was extremely limited and that any impact was, instead, beneficial.

## C. Material Adverse Change

■ The jury's finding that no material adverse change had occurred as of October 16 and 22, 1979, and November 5, 1979, is not contrary to the weight of the evidence because of Mr. Cappalonga's testimony and the weaknesses exposed in the testimony of Mr. Moore. Secondly, the claim that Girard had fraudulently represented that no default had occurred was, as a matter of law, not available to the Insurance Companies with respect to Conditional Sale Agreements transferred to Girard at "Interim Closings" held prior to October 1, 1979, because of the testimony of the Insurance Companies' own expert that "[m]y opinion is that the condition of NRUC was adversely impacted during the first—the fourth quarter of 1979 starting on October 1st 1979." (N.T. 7.25).

Defendants' remaining contentions are without merit for reasons expressed elsewhere in this opinion and at trial.

## V. Specific Performance

Girard prayed in its amended complaint for an equitable decree of specific performance. Upon consideration of the parties' offers of proof with respect to the issues of specific performance and adequacy of damages, the testimony at trial, and the contract documents and other exhibits offered into evidence, the Court finds that Girard is entitled to specific performance as a matter of law.

## A. Findings of Fact

1. The Insurance Companies and Girard agreed that Girard would serve as an "Interim Lender" under the Participation Agreement with respect to a $30 million fourteen year loan to NRUC.

2. The contract documents contain repeated references to the Reassignment of the Conditional Sale Agreements and boxcar security interests by Girard to the Insurance Companies. See Third "Whereas Clause," Participation Agreement; Article 23, Conditional Sale Agreement; Section 9, Agreement and Assignment; and Further Assignment and Agreement.

3. In addition to the boxcar security interests, the Insurance Companies have the right to Stock Purchase Warrants under Section 3 of the Participation Agreement as further security for their investment.

4. Girard does not have a right to Stock Purchase Warrants.

5. Girard presently holds four Conditional Sale Agreements, acquired at the November 8, 15 and 27, 1979 "Interim Closings," representing 200 railroad boxcars. (N.T. 9.7).

6. The Insurance Companies hold other Conditional Sale Agreements obtained from Girard at the September 12, 1979, and November 2 and 16, 1979 "Reassignment Closings," representing 450 boxcars. (N.T. 9.7).

7. A declaration of default under the Conditional Sale Agreement provides the right of the holder to take possession of the railroad boxcars as security under the Conditional Sale Agreement. Article 16, Conditional Sale Agreement.

8. No default has been declared by the Insurance Companies or Girard for fear that NRUC's bankruptcy would result. (N.T. 9.6; 9.10–9.11).

9. All of the 650 boxcars, including the 200 in which Girard presently holds a security interest, are owned by NRUC. (N.T. 9.7).

10. Thirty-six of the 200 boxcars now in dispute are presently out-of-service, while the remaining 164 are either in service or in storage. (N.T. 9.19).

11. NRUC asserts a 20% equitable interest in the 600 boxcars because of NRUC's payments toward the 20% balance of the purchase price. (N.T. 9.10).

## B. Conclusions of Law

Specific performance may be granted by a court of equity in its own discretion if there is no adequate remedy at law. *Portnoy v. Brown*, 430 Pa. 401, 243 A.2d 444, 446 (1968); *Roth v. Hartl*, 365 Pa. 428, 75 A.2d 583, 586 (1950). As was stated by Circuit Judge Adams in *First National State Bank of New Jersey v. Commonwealth Federal Savings and Loan*, 610 F.2d 164 (3d Cir. 1979):

> Generally, the remedy at law is said to be inadequate in two situations: (1) where damages would be insufficient because the subject matter of the contract is of such a special nature that it resists translation into quantitative terms—the damage remedy " 'would not be a just and reasonable substitute for or representative of that subject-matter in the hands of the party who is entitled to its benefit' "; or (2) where "damages are impracticable" because "it is impossible to arrive at a legal measure of damages at all, or at least with any sufficient degree of certainty."

*Id.* at 171 (citation omitted). Although Judge Adams' analysis pertains to New Jersey law, the Court finds his reasoning persuasive here. In *First National*, the trial court granted specific performance of an agreement by a long-term lender to reimburse the short-term lender with respect to the mortgage financing of a shopping center in Camden, New Jersey. The Third Circuit affirmed the decree of specific performance for the reasons that an accurate calculation of damages would be impracticable and that specific performance was reasonable to place the risk of the success or failure of the venture on the long-term lender. *Id.* at 174. Defendants seek to distinguish *First National* on the basis that it pertained to a shopping center—an interest in land. The Court finds, however, that

*First National* is readily applicable because of the Third Circuit's emphasis on the adequacy of damages and assignment of the risk of the success or failure of the venture to the long-term lender, and not the inherent uniqueness of land.

In the present case, the Court finds that any award of damages would be insufficient as a matter of law because of the special contractual arrangement between the Insurance Companies and Girard. As in *First National*, Girard only agreed to serve as an "Interim Lender" under a long-term $30 million loan package extended by the Insurance Companies to NRUC. The contract documents show that both parties "contemplated" that the Conditional Sale Agreements and boxcar security interests would be reassigned to the Insurance Companies. It is also important that the Insurance Companies have special rights under the Participation Agreement, such as Stock Purchase Warrants, which Girard does not. Any other remedy under this special arrangement would be inadequate as a matter of law because the act of reassignment was what was bargained for by both parties. By obtaining specific performance, Girard obtains both the money which is owed, and the benefits accompanying the assignment of the Conditional Sale Agreements and security interests "without any recourse hereunder." Further Assignment and Agreement, Section 1. Thus, Girard will no longer be required to monitor the movement of the boxcars, which to this date are still owned and operated by NRUC. Because of the very nature of the long-term investment by the Insurance Companies and the limited role played by Girard as the "Interim Lender," it would not be unreasonable to place the risk of success or failure of the long-term investment on the Insurance Companies who originally agreed to the $30 million loan arrangement. To this date, NRUC is still a viable business entity engaged in the management and operation of railroad boxcars. Additionally, the Insurance Companies already hold security interests in the other 450 boxcars. For all of these reasons, damages would not serve as a "just and reasonable substitution" for the reassignment of the Conditional Sale Agreement and repayment of Girard.

Moreover, an award of damages would be impracticable because it would be "impossible to arrive at a legal measure of damages at all, or at least with any sufficient degree of certainty." The value of the boxcars has continually declined from the $40,000.00 purchase price in the Fall of 1979. Furthermore, Girard only holds the Conditional Sale Agreements which only provide for the actual possession of the security interests upon the declaration of a default. As stated earlier, neither the Insurance Companies nor Girard have declared a default because of its expected impact on NRUC. Therefore, the market for the Conditional Sale Agreements is uncertain and could only be based on pure speculation. Any calculation of damages would require a complex inquiry into an assessment of the depreciated value of the boxcars, the changes in market price, the individual conditions of the boxcars, the adjustments for costs and expenses incurred during the management of the boxcars, as well as an accounting for the gross and net earnings of each boxcar. In light of the fact that the jury rejected the principal defenses offered by the Insurance Companies, and the complex and speculative nature of the calculation of any damages to be awarded, specific performance is the only adequate remedy to be provided in this case because of the certainty and precision which would result from the actual reassignment of the Conditional Sale Agreements in exchange for the monies owed to Girard. This was what was bargained for and actually practiced prior to the breach of the Agreement.

### C. *Defendants' Remaining Contentions*

Defendants assert as ground for a new trial that they were deprived of their right to a jury trial on the issue of damages. Defendants are not entitled to a jury trial if the Court deems that the equitable remedy of specific performance is appropriate because damages are an inadequate remedy at law. *See Beacon Theatres v.*

*Westover,* 359 U.S. 500, 510, 79 S.Ct. 948, 956, 3 L.Ed.2d 988 (1959). Secondly, the Insurance Companies contend they were materially prejudiced because the Court did not allow further testimony to be presented with respect to damages. As stated earlier, the Court listened to both counsels' offers of proof and argument with respect to damages. The Court also had the benefit of hearing the testimony of the witnesses at trial and examining the contractual documents and other exhibits offered into evidence. Any further testimony to be offered by the Insurance Companies on the issue of specific performance would have only been unduly burdensome to the Court. The Court finds that there is a sufficient basis for specific performance present on the record, as set forth in the preceding section.

## VI. *Prejudgment Interest*

Girard seeks an award of prejudgment interest to be calculated at 110% above Girard's Prime Rate, or at prevailing interest rates, from March 1, 1980, to the date of judgment, July 15, 1981. Under Pennsylvania law, in cases of breach of contract, interest is allowable at the legal rate from the date the payment is wrongfully withheld, where the damages are liquidated and certain, and the interest is readily ascertainable through computation. *Penneys v. Pennsylvania Railroad Company,* 408 Pa. 276, 183 A.2d 544, 546–47 (1962); *Palmgreen v. Palmer's Garage,* 383 Pa. 105, 117 A.2d 721, 722 (1955); *Restatement of Contracts* § 337 (1932). In Pennsylvania, the legal rate of interest is 6%. 41 Pa. Const.Stat.Ann. § 202 (Purdon Supp.1981–1982). *See generally Peterson v. Crown Financial Corp.,* 498 F.Supp. 1177 (E.D.Pa. 1980).

In this case, an award of prejudgment interest would be equitable because the Insurance Companies have used the money which was withheld from the date of breach and reinvested it at the current prevailing interest rates. Therefore, an award of prejudgment interest is necessary to prevent the unjust enrichment of the Insurance Companies as a result of the breach, as well as the fact that Girard has been deprived of the use of this money as an investment vehicle during the same period. Therefore, Girard will be awarded prejudgment interest at the legal rate of 6% per annum on the $6,494,200.00 owed to Girard from the date of March 1, 1980, to July 15, 1981, minus $26,882.63 which Girard received from NRUC on December 11, 1980, as a payment under the Conditional Sale Agreements.

An appropriate order will be entered.

## APPENDIX A

| Interim Closings | Amounts Advanced By Girard | Reassignment Closings | Amounts Advanced To Girard By JH and CG |
|---|---|---|---|
| Aug. 17, 1979 | $2,454,000 | | |
| Aug. 28, 1979 | $2,454,000 | Sept. 12, 1979 | $4,908,000 |
| Sept. 17, 1979 | $1,636,000 | | |
| Sept. 28, 1979 | $1,636,000 | | |
| Oct. 22, 1979 | $1,636,000 | Nov. 2, 1979 | $4,908,000 |
| Oct. 16, 1979 | $1,619,400 | | |
| Oct. 16, 1979 | $1,619,400 | | |
| Nov. 5, 1979 | $1,636,000 | Nov. 16, 1979 | $4,874,800 |
| Nov. 8, 1979 | $1,619,400 | | |
| Nov. 15, 1979 | $1,619,400 | | |
| Nov. 27, 1979 | $1,636,000 | Dec. 3, 1979 | --- |
| Nov. 27, 1979 | $1,619,400 | | |
| Dec. 6, 1979 | --- | | |
| Dec. 13, 1979 | --- | Dec. 27, 1979 | --- |

## ASSIGNMENT

This Assignment dated as of          , 19   , is made by GIRARD BANK (hereinafter called Girard) to THE CONNECTICUT BANK AND TRUST COMPANY (hereinafter called the Assignee) as Agent for CONNECTICUT GENERAL LIFE INSURANCE COMPANY and JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY pursuant to a Decree dated          , 1981, by the Honorable Louis C. Bechtle of the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 79–4676, a copy of which is attached hereto as Exhibit "A".

This Assignment relates to that certain Conditional Sale Agreement dat-

**898**

ed          , 1979 (hereinafter called the Conditional Sale Agreement) between (hereinafter called the Builder) and NATIONAL RAILWAY UTILIZATION CORPORATION and PICKENS RAILROAD COMPANY covering the railroad equipment described in Annex B thereto. Girard is the Assignee of the Conditional Sale Agreement under an Agreement and Assignment dated as of          , 1979 between it and the Builder.

FOR GOOD AND VALUABLE CONSIDERATION, RECEIPT WHEREOF IS HEREBY ACKNOWLEDGED, GIRARD AGREES AS FOLLOWS:

1. *Assignment.* Girard hereby assigns, transfers and sets over to the Assignee, its successors and assigns, all of Girard's right, title and interest in and to the Conditional Sale Agreement, including any rights Girard may have to any funds which NATIONAL RAILWAY UTILIZATION CORPORATION is holding for Girard or otherwise in connection with the Conditional Sale Agreement. Article 23 of the Conditional Sale Agreement is annulled.

IN WITNESS WHEREOF, Girard, pursuant to due authority, has caused this instrument to be executed in its name by its duly authorized official as of the date first written above.

GIRARD BANK
BY_____

(CORPORATE SEAL)
ATTEST:

_____
Secretary
COMMONWEALTH OF PENNSYLVANIA :
                                                   :
                                                   :  ss:
COUNTY OF PHILADELPHIA          :

On this          day of          , 19  , before     me,     personally     appeared          , to me personally known, who, being by me duly sworn, says that he is an officer of GIRARD BANK, that one of the seals affixed to the foregoing instrument is the corporate seal of said corporation, that said instrument was signed and sealed on behalf of said corpora-

tion by authority of its Board of Directors and he acknowledged that the execution of the foregoing instrument was the free act and deed of said corporation.

_____
Notary Public

(Notarial Seal)
My Commission expires: