KROBLIN REFRIGERATED XPRESS, INC., Appellant in No. 85–3719,

v.

Wernert J. PITTERICH.

Wernert J. PITTERICH, Suzanne E. Rickards, Executrix of the Estate of E.C. McCormick, Harold D. Doyle, Dorothy Ortbring, Charles F. Rodgers, Gene Rotondi, John Trapp, Gerhard J. Brennan, William Kirk, A. David Millner, Edward F. Bowes, Robert E. Gesell, and Edward Kramer

v.

KROBLIN REFRIGERATED XPRESS, INC., Kroblin Transportation System, Inc., and Allen E. Kroblin. (Four Cases)

Appeal of KROBLIN REFRIGERATED XPRESS, INC., in No. 85–3720.

Appeal of Suzanne E. RICKARDS, Executrix of the Estate of E.C. McCormick, Harold P. Doyle and Dorothy Ortbring, in No. 86–3005.

Appeal of Wernert J. PITTERICH, in No. 86–3006.

Appeal of Harold P. DOYLE and Dorothy Ortbring, in No. 86–3332.

Nos. 85–3719, 85–3720, 86–3005, 86–3006 and 86–3332.

United States Court of Appeals, Third Circuit.

Argued Sept. 29, 1986.

Decided Nov. 6, 1986.

Rehearing Denied Dec. 1, 1986.

David E. Lehman (argued), McNees, Wallace & Nurick, Harrisburg, Pa., for appellants in Nos. 86–3005, 86–3332 and for cross-appellees in Nos. 85–3719, 85–3720.

Michael P. Pitterich (argued), Pittsburgh, Pa., for appellant Wernert J. Pitterich in No. 86–3006.

Charles F.C. Ruff (argued), Hillary A. Sloan, Covington & Burling, Washington, D.C., Stephen Jurman, McCann, Garland, Ridall & Burke, Pittsburgh, Pa., for cross-appellant in Nos. 85–3719, 85–3720, for appellees in Nos. 86–3005, 86–3006, and for appellees in No. 86–3332.

Before ALDISERT, Chief Judge, and WEIS and MANSMANN, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Chief Judge.

The deregulation of the trucking industry during the Carter Administration and the complicated history of various sales of a trucking company that possessed valuable transportation rights prior to deregulation form the backdrop for numerous issues that command our attention here in consolidated appeals from a district court bench trial. The district court determined that Kroblin Transportation System, Inc. and Kroblin Refrigerated Xpress, Inc., as guarantor, breached an agreement to purchase Fleetwood Investment Company, a holding company that owned A.C.E. Freight, Inc. For relief, the court ordered specific performance of the contract of sale including payment of notes and prejudg-

ment interest. The court also determined that a $100,000 claim of the principal seller, Wernert J. Pitterich, was not enforceable against the purchasers for lack of consideration.

We have appeals from all sides. Pitterich argues that adequate consideration supports his claim. Kroblin Refrigerated Xpress, Inc. ("Refrigerated") raises six questions of contract law: whether the district court (1) properly construed a "shall guarantee" clause in the sales agreement; (2) properly rejected a defense of frustration of purpose following the advent of deregulation; (3) properly ordered specific performance instead of awarding money damages; (4) properly determined that two shareholders of a corporation had standing to sue Refrigerated for payment on a promissory note; (5) properly decided that the law firm of Bowes, Millner & Rodgers did not breach a fiduciary duty by acting as counsel to the purchaser, Refrigerated, while holding a financial interest in Fleetwood, the seller; and (6) properly ordered Refrigerated to accept a note from Fleetwood to Pitterich as satisfaction of Pitterich's obligation to Refrigerated. Doyle and Ortbring, as well as Rickards, as executrix of the estate of E.C. McCormick, appeal from the district court's determination of the proper rate of prejudgment interest to accompany its remedy.

We will affirm the district court's determinations adverse to Refrigerated and will affirm the court's application of the Pennsylvania prejudgment interest rate. We will reverse, however, the district court's determination that adequate consideration did not support Pitterich's separate claim. The trial court had diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, and applied Pennsylvania substantive law to the present controversy except for the issue relating to Refrigerated's acceptance of the Fleetwood note.

## I.

This lawsuit evolved from the attempted sale of A.C.E. Freight, Inc. to Refrigerated.

Although ACE was an unprofitable company, it held one valuable asset: an ICC certificate of authority permitting it to carry freight from the northeast portion of the country to Chicago. The first of a series of sales of ACE's certificated rights began in 1968 when its shareholder, E.C. McCormick, sold ACE to Great Lakes Express Company ("Lakes"), a company owned by members of the Doyle family, including Harold Doyle and his sister, Dorothy Ortbring. Approximately nineteen shareholders constituted the Doyle group. Wernert Pitterich entered the scenario in 1970 when Lakes hired him as general manager of ACE.

The second sale took place in 1971 when Lakes sold ACE to the Fleetwood Investment Corporation, a holding company consisting of twelve investors. Edward Bowes, A. David Millner, and Charles Rodgers of the law firm of Bowes, Millner & Rodgers were three of the investors. Pitterich held twenty percent of the Fleetwood stock. Two notes figured in the sale by Lakes to Fleetwood: ACE gave McCormick an unsecured note for $1,000,000 ("McCormick note") and Fleetwood gave Lakes a note for $800,000 secured by ACE stock ("Lakes note").

After three years, in 1974, Pitterich moved to take over Fleetwood. He purchased the eighty percent interest of the other eleven Fleetwood shareholders for $80,000 in cash and $480,000 in promissory notes payable to Fleetwood ("Fleetwood notes"). Pitterich borrowed the cash payoff from John Loudermilk and, in return, gave Loudermilk an interest in certain Fleetwood stock.

Allen Kroblin then entered the scene and laid the groundwork for the third sale of ACE. Kroblin owned several trucking companies and was chief executive officer of Refrigerated, which held ICC certificates of authority in the midwestern and eastern United States, but none in the Pennsylvania-Chicago corridor. Kroblin became interested in purchasing ACE in order to acquire ACE's operating authority, which included the corridor rights between

Pennsylvania and Chicago. Negotiations began with Pitterich, who controlled Fleetwood which in turn owned ACE.

Before he could totally convey Fleetwood to Kroblin, Pitterich had to buy out Loudermilk's interest in Fleetwood. On November 11, 1976, Kroblin agreed to lend Pitterich $200,000 in exchange for a note from Pitterich ("Pitterich note"). An accompanying pledge agreement provided that Pitterich would use the money to repurchase Loudermilk's interest in Fleetwood. Pitterich subsequently used the money for this purpose. With Loudermilk out of the picture, Kroblin could deal exclusively with Pitterich. In December 1976, Kroblin retained the Bowes, Millner firm to represent Refrigerated in connection with the ICC proceedings relating to the ACE purchase.

On March 17, 1977, the third sale took place. Refrigerated and Pitterich entered into a purchase agreement for Fleetwood. This was a highly complicated transaction that required an ICC grant of temporary authority to the purchaser pending final approval of the sale. In exchange for Pitterich's Fleetwood stock, Refrigerated agreed to pay Pitterich $10,000 in cash and make payments on the three outstanding notes to McCormick, Lakes, and Fleetwood. The agreement provided that the transaction would be consummated upon final approval of the ICC.

On the same date, Refrigerated and Pitterich entered into a noncompetition agreement. Refrigerated agreed to pay Pitterich $100,000 over a period of five years in exchange for Pitterich's promise not to compete with ACE in the Pennsylvania-Chicago corridor during this time. The agreement, however, gave Pitterich the right to terminate the covenant not to compete and receive the $100,000 immediately.

On behalf of Refrigerated, the law firm of Bowes, Millner filed with the ICC applications to obtain temporary authority over the ACE territories and approval of the Fleetwood-Refrigerated transaction. The ICC thereafter issued Refrigerated temporary authority to operate ACE; Refrigerated proceeded to use ACE's transportation rights in the Pennsylvania-Chicago corridor. On May 1, 1977, Refrigerated began making payments on the notes payable to McCormick, Lakes, and Fleetwood. Refrigerated and Pitterich subsequently entered into a first supplemental agreement which altered the structure of the temporary authority but did not affect the essence of the March 17 agreement. On October 12, 1977, the ICC authorized Refrigerated to purchase the Fleetwood stock.

In the fall of 1977, however, Kroblin reorganized his companies. Under his plan, Arrow Freight Lines, Inc. and a new trucking company, Kroblin Transportation System, Inc., would become the purchasers of Fleetwood. ACE would then be merged into Kroblin Transportation which would thereafter operate as a general carrier, while Refrigerated would transport refrigerated goods.

On November 17, 1977, Pitterich and Refrigerated entered into a second supplemental agreement substituting Arrow/Kroblin Transportation as the Fleetwood purchaser. In exchange, Refrigerated guaranteed the terms of the original and first supplemental agreements. It is this guarantee clause that constitutes a major question for decision in these appeals. The Bowes, Millner firm thereafter filed applications with the ICC seeking approval of the Arrow/Kroblin Transportation substitution.

In 1979, the deal went flat. In anticipation of deregulation of the trucking industry, the ICC became increasingly liberal in granting certificates of authority. Realizing that the once-regulated Pennsylvania-Chicago corridor rights could now be readily obtained from the ICC, Kroblin sought to block ICC approval of the Fleetwood-Arrow/Kroblin Transportation deal. The ICC, however, approved the sale effective January 1981. Kroblin thereafter refused to consummate the transaction. Refrigerated ceased payments on the McCormick, Lakes, and Fleetwood notes after July 1, 1979 and refused to pay Pitterich under the noncompetition agreement. The lawsuits followed.

## II.

Refrigerated first contends that the district court erred in holding that the guarantee clause in the second supplemental agreement was unambiguous:

All of the terms and conditions set forth in the original agreement between Fleetwood and KRX [Refrigerated] shall remain in full force and effect and KRX *shall guarantee* these terms and conditions will be met as set forth in the original and first supplemental agreements.

App. at 645 (emphasis supplied). Whether the guarantee clause is ambiguous is critical to the issue of Refrigerated's liability on the McCormick, Lakes, and Fleetwood notes. If unambiguous, the clause pins liability squarely on Refrigerated. Refrigerated argues, however, that the clause is not clear, and that the parties intended Refrigerated's liability under the guarantee to attach only after ACE merged into Kroblin's new company, Kroblin Transportation, an event that never occurred.

### A.

■■■ Determining whether contract terms are clear or ambiguous is a question of law, *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir.1980), and review of this issue is plenary. *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir. 1981). In making the ambiguity determination, a court must consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of those meanings. *Mellon Bank*, 619 F.2d at 1011. A court should not preclude an alternative meaning simply because the words at issue are legal terms of art. *Id.* at 1013.

The district court advanced several factors to support its holding that the guarantee clause was unambiguous. The court examined the wording of the clause. *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, Nos. 80–209, 81–574, slip op. at 29 (W.D.Pa. Oct. 11, 1985), *reprinted in* app. at 11–55. The court also reviewed the circumstances surrounding the transaction. It scrutinized a letter detailing Kroblin's proposal of merger and the application requesting ICC approval to substitute Arrow/Kroblin Transportation for Refrigerated as purchaser of Fleetwood. *Kroblin*, slip op. at 27–28. The court, having examined the extrinsic evidence offered by defendants, concluded that the word "guarantee" as used in the clause was not ambiguous.

### B.

Refrigerated argues that the language used in the guarantee clause is unclear and offers extrinsic evidence in support of its contention that Refrigerated's liability under the clause did not attach until ACE merged into Kroblin Transportation. Refrigerated points to numerous documents filed by plaintiffs, including the complaint which states that under the second supplemental agreement, Kroblin Transportation "was substituted as a party for [Refrigerated] and agreed to assume [its] rights and duties" under the original and first supplemental agreements. App. at 62, ¶ 14. Refrigerated also cites statements by various parties, including Rodgers (*id.* at 224), Doyle (*id.* at 323–25, 333–34), and Millner (*id.* at 137–39) to support its alternative meaning.

■■■ We reject Refrigerated's contention that the language of the guarantee clause is unclear. The clause states in simple words that Refrigerated "shall guarantee" the terms of the purchase transaction. Furthermore, the evidence offered by Refrigerated is not persuasive to rebut the plain language of the guarantee clause. We do not find sufficient evidence to suggest that a merger of ACE into Kroblin Transportation was a condition precedent to the guarantee. Therefore, we conclude that the district court did not err in holding that the guarantee clause was unambiguous.

### C.

It is well settled that unambiguous writings are construed as a matter of law. *Ram Construction Co. v. American*

*States Insurance Co.*, 749 F.2d 1049, 1052 (3d Cir.1984); *Mellon Bank*, 619 F.2d at 1011 n. 10 (citing *Broker Title Insurance Co. v. St. Paul Fire and Marine Insurance Co.*, 610 F.2d 1174 (3d Cir.1979)). Review of the district court's construction of a contract is therefore plenary. *Ram Construction Co.*, 749 F.2d at 1053. The district court here held that the guarantee clause took effect upon signing and thus made Refrigerated the guarantor of the transaction. Based on our review of the language used by the parties, we hold that the district court did not err in its construction of the guarantee clause.

### III.

Refrigerated next argues that even if we assume that it is liable as guarantor under the second supplemental agreement, the principle of frustration should be applied to relieve Refrigerated of liability for payment on the McCormick, Lakes, and Fleetwood notes. Frustration of purpose is defined in the Restatement (Second) of Contracts § 265 (1979):

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Pennsylvania law accepts this principle. *Alvino v. Carraccio*, 400 Pa. 477, 482, 162 A.2d 358, 361 (1960); *Greek Catholic Congregation of Olyphant v. Plummer*, 338 Pa. 373, 382, 12 A.2d 435, 439 (1940). Refrigerated argues that because deregulation of the trucking industry prevented it from recouping a substantial portion of the Fleetwood purchase price by reselling the portion of ACE's authority that it already held, its liability for payment on the notes was extinguished. It refers to this aspect of ACE's transportation rights as "duplicate ACE authority," something of impressive commercial value. The district court held that Refrigerated's principal

purpose—obtaining ACE's operating authority in the Pennsylvania-Chicago corridor—was not substantially frustrated. *Kroblin*, slip op. at 31.

### A.

The district court's finding as to Refrigerated's principal purpose in acquiring ACE is subject to reversal only if clearly erroneous. *Universal Minerals*, 669 F.2d at 101–02. The evidence in this case supports the district court's finding. By acquiring ACE's transportation rights, Refrigerated could avoid "trip leasing" freight carried over the Pennsylvania-Chicago corridor to another trucking company. ACE's ICC certificate thus provided Refrigerated with a way to bridge the gap between its eastern and midwestern authority. *Kroblin*, slip op. at 7 (finding 31).

Refrigerated contends that although obtaining ACE's authority was the main reason for the purchase, reselling ACE's duplicate authority was nevertheless a principal purpose of the contracting party. Indeed, Attorney Millner had advised Kroblin that he could possibly resell the ACE duplicate authority for $1,000,000. *Id.* at 19 (finding 69). The evidence, however, does not support the notion that Refrigerated purchased ACE merely to resell its duplicate authority. Reselling part of ACE's authority to recoup a portion of the purchase price was collateral to Refrigerated's primary desire to acquire ACE's operating rights in the Pennsylvania-Chicago corridor.

### B.

Given that Refrigerated's principal purpose in acquiring ACE was to procure additional corridor rights, the district court refused to apply the frustration principle. Because this issue involves the application of legal precepts, review is plenary. *Universal Minerals*, 669 F.2d at 102.

The time sequence here is important. Refrigerated assumed temporary control of ACE in May 1977. *Kroblin*, slip op. at 12 (finding 49). It was not until 1979 that the

ICC liberalized the issuance of certificates of authority under the new concept of deregulation. *Id.* at 19 (finding 70). And it was not until 1981 that Kroblin refused to consummate the purchase transaction. *Id.* at 21 (finding 80). Thus, it can be seen that Refrigerated and Kroblin Transportation used ACE's authority for over four years after agreeing to purchase Fleetwood—from May 1977 through June 1981. *Id.* at 22 (finding 82). The Kroblin companies shipped freight over and generated revenues from the territory evidenced by ACE's certificated rights. It cannot reasonably be denied that Refrigerated received the substantial benefit of its bargain.

It also must be said that Refrigerated's own delay in consummating the transaction contributed to any losses the companies sustained. Had Refrigerated lived up to its contractual obligations when the ICC approved the sale in 1977, ACE's duplicate authority could have been resold in a regulated trucking market. Instead, in 1977, Kroblin chose to reorganize his various motor carriers. He further delayed effectuating the sales agreement when in 1979–1980 he deliberately sought to block ICC approval of the sale. *Id.* at 19–21 (findings 71, 76, 77). Because Refrigerated contributed to its losses, it cannot now claim that its purpose in purchasing ACE was frustrated as a matter of law. *See* Restatement (Second) of Contracts § 265 comment b (1979). We conclude, therefore, that the district court did not err in refusing to apply the frustration doctrine to the present case.

## IV.

Refrigerated next contends that the district court erred in awarding specific performance against Refrigerated and Kroblin Transportation. It argues that in the event of default, the payee of a note can only recover, as monetary damages, those sums which have become due at the time the complaint was filed.

■ Specific performance may be granted by a court of equity in its discretion if there is no adequate remedy at law.

*Girard Bank v. John Hancock Mutual Life Insurance Co.*, 524 F.Supp. 884, 895 (E.D.Pa.1981), *aff'd mem.*, 688 F.2d 820 (3d Cir.1982); *Portnoy v. Brown*, 430 Pa. 401, 403, 243 A.2d 444, 446 (1968). When a court cannot arrive at a legal measure of damages with a sufficient degree of certainty, no adequate remedy at law exists. *Girard Bank*, 524 F.Supp. at 895. In this situation, an award of damages is impracticable. As to the issue of whether there is an adequate remedy at law, our review is plenary. *Id.* at 896. The district court here set forth two reasons for awarding specific performance. First, "an award of damages would be inappropriate because it would be very difficult to determine the value of the ACE authority during the time Kroblin used it." *Kroblin,* slip op. at 43. It bears mention that the parties did not allocate a price for Refrigerated and Kroblin Transportation's four-year use of ACE's authority, relying instead on a token $1.00 per month plus payment of ACE's expenses. App. at 633, ¶ 1.1. The court also explained that specific performance was needed to protect the expectancy interest of the non-breaching parties. *Kroblin,* slip op. at 43.

■ We deem it significant Kroblin did not acquire ACE for its financial performance as a transportation company. As we have repeatedly emphasized, Kroblin was interested only in acquiring ACE's certificate of authority so that the Kroblin companies could carry freight uninterrupted from New Jersey to Chicago and then west. Then, too, ACE figured into a discrete niche in Kroblin's reorganization plans. It was to be enfolded in Kroblin Transportation's operation; Refrigerated was to be a specialized carrier. We therefore hold that the district court did not err in concluding that accurate calculation of damages was impracticable. *See First National State Bank v. Commonwealth Federal Savings & Loan Association*, 610 F.2d 164, 171, 173 (3d Cir.1979) (ample evidence to support district court's conclusion that accurate calculation of damages was impracticable); *Girard Bank*, 524 F.Supp.

at 896. Thus, specific performance of the purchase agreement was an available remedy in this case.

## V.

To address Refrigerated's next contention we must return to what we have described in our narrative as the first sale of ACE to Great Lakes Express Company, which was owned by members of the Doyle family, including Harold Doyle and his sister, Dorothy Ortbring. They had a profound interest in pressing Kroblin to honor the obligation under the Lakes note after the default had occurred. Refrigerated has challenged the standing of these two shareholders to sue on a promissory note payable to Great Lakes Express. Because Doyle and Ortbring "presented no proof of any negotiation or transfer of the [Lakes] note" to the shareholders, Refrigerated argues that they lack standing to sue on the Lakes note. Br. for appellants at 32. The district court held that these plaintiffs had standing. *Kroblin,* slip op. at 24. Review of this issue is plenary. *Universal Minerals,* 669 F.2d at 102.

■ The course of dealing or conduct of the parties can evidence a contractual relationship between parties and thus can confer standing on an individual as a direct party to the agreement. *Girard Bank v. John Hancock Mutual Life Insurance Co.,* 524 F.Supp. 884, 890 (E.D.Pa.1981), *aff'd mem.,* 688 F.2d 820 (3d Cir.1982). Here, the documentary evidence and conduct of the parties support the conclusion that Doyle and Ortbring were direct parties to the March 17 agreement.

■ Although the Lakes note was by its terms payable to Great Lakes Express Company, the conduct of Refrigerated and the Lakes shareholders plainly evidence a contractual relationship between these parties. By agreeing to purchase Fleetwood, Refrigerated assumed the Lakes note. Prior to signing the purchase agreement, Allen Kroblin negotiated a payment plan for the Lakes note directly with the Lakes shareholders. In a letter to Kroblin, Doyle laid out a payment schedule on the note that was approved by the Lakes shareholders. App. at 626. This schedule included payments both before and after the purchase, and gave each shareholder an option as to repayment ten years after the purchase. Kroblin agreed to the terms of this letter. *Id.* at 627. Indeed, Kroblin recognized he was dealing with the Lakes shareholders as individuals when he stated in an ICC application that the Lakes note was "owed by A.C.E. to the individual shareholders of Great Lakes Express Co." and that the Lakes note had been "assigned to the shareholders of Great Lakes Express Co." *Id.* at 672, 666.

Since Refrigerated directly injured the Lakes shareholders by refusing to continue payments on the Lakes note, we hold that the district court did not err in concluding that these plaintiffs had standing to sue under the Lakes note. *Compare Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727, 732 (3d Cir.1970) (shareholder does not have standing where primary injury was inflicted on the corporation and only injury to shareholder was the indirect harm consisting of diminution in value of his corporate shares).

■ Refrigerated argues now for the first time that if Doyle and Ortbring had standing, the district court should have required joinder of the remaining seventeen Lakes shareholders as indispensable parties, as they all were joint payees on the Lakes note. *See* Restatement (Second) of Contracts § 298 comment b (1979). The issue of failure to join an indispensable party may be raised for the first time on appeal. *Provident Tradesmens Bank and Trust Co. v. Patterson,* 390 U.S. 102, 109, 88 S.Ct. 733, 737, 19 L.Ed.2d 936 (1968); *GTE Sylvania, Inc. v. Consumer Product Safety Commission,* 598 F.2d 790, 798 (3d Cir.1979), *aff'd,* 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). We must, however, consider the fact that a judgment binding on the parties has already been reached after extensive litigation. *Provident Tradesmens Bank,* 390 U.S. at 111; *GTE Sylvania,* 598 F.2d at 798.

■ Refrigerated has made no showing that failure to join the remaining seventeen Lakes shareholders will prevent complete relief from being granted in this contract action, or that the absentee shareholders' rights will be prejudiced if not joined. Moreover, Refrigerated has not shown how it or the court will be subject to multiple litigation if the absentee shareholders are not joined. The district court's order requiring Refrigerated to make payments on the three notes will prevent subsequent litigation, since all Lakes shareholders will receive payment on their note. We are persuaded the factors outlined in Rule 19(a), F.R.Civ.P., do not require that the remaining seventeen shareholders be joined in the present suit.

## VI.

Refrigerated next contends that the district court erred in concluding that plaintiffs Bowes, Millner, and Rodgers did not breach a fiduciary duty by acting as counsel to Refrigerated, the purchaser, while holding a financial interest in Fleetwood, the selling company. Refrigerated argues that the attorneys advanced their own financial interests at the expense of the Kroblin companies, and therefore should be required to disgorge any money paid to them from Refrigerated. Review of this issue is plenary. *Universal Minerals*, 669 F.2d at 102.

Refrigerated suggests three ways in which the Bowes, Millner firm breached its fiduciary duty to Refrigerated. First, although Bowes, Millner advised Allen Kroblin of its interest in Fleetwood when he retained them in 1976, the firm made no continuing disclosure of the conflicts of interest that developed over the ensuing months; second, Millner drew on confidential information in proposing that Kroblin personally guarantee the ACE transaction; and, third, Rodgers and Millner were intimately involved in the negotiation and drafting of critical documents.

## A.

It is well settled in Pennsylvania that an attorney involved in a transaction with a client owes a duty of good faith and full disclosure. The attorney-client relationship calls for the exercise of the "most perfect good faith," and "no shadow of anything like deception or unfair dealing upon the part of an attorney can be countenanced." *Kribbs v. Jackson*, 387 Pa. 611, 621, 129 A.2d 490, 495–96 (1957). When the propriety of a transaction between an attorney and client is put at issue, the burden is on the attorney to show that he fully disclosed any interest to the client and that the transaction is fair and conscionable. *Meara v. Hewitt*, 455 Pa. 132, 136, 314 A.2d 263, 265 (1974); *Leach v. Hough*, 352 Pa. Super. 213, 507 A.2d 848, 851 (1986); *Lynch v. Hook*, 298 Pa.Super. 27, 30, 444 A.2d 157, 159 (1982).

## B.

■ Here, Kroblin retained Bowes, Millner to represent Refrigerated in the ICC proceedings relating to the Fleetwood purchase. Both Millner and Rodgers testified that they disclosed their financial interests in Fleetwood prior to representing Refrigerated. App. at 215, 237–38. Rodgers also testified that in 1976 he detailed all documentation involving his firm and Fleetwood "from day one." *Kroblin*, slip op. at 7–8 (finding 32), app. at 183. Kroblin testified that he knew that Bowes, Millner, and Rodgers held interests in Fleetwood. App. at 444. In addition to disclosing fully to Kroblin any financial interest, the district court found that Bowes, Millner disclosed its role in the transaction to the ICC. *Kroblin*, slip op. at 37. In approving Kroblin Transportation's purchase of ACE, the ICC stated that "[w]e are convinced of the business sophistication of both buyer and seller in choosing their counsel and fully understanding counsel advice." App. at 779. Although the law firm made no further disclosures to Kroblin after 1976, the district court found that Kroblin had years of experience in the trucking industry and had been involved in numerous business transactions and ICC proceedings. *Kroblin*, slip op. at 39. The court considered

this level of sophistication in determining that the law firm received Kroblin's informed consent prior to representing Refrigerated. *Id.* We conclude that the district court did not err in holding that Bowes, Millner's disclosure and Kroblin's informed consent did not amount to a breach of fiduciary duty by the law firm.

Refrigerated does not demonstrate how the law firm advanced its own interests at the expense of Kroblin when it drafted relevant documents. Bowes, Millner was not representing Refrigerated when it drafted the purchase, noncompetition, and first supplemental agreements. *Id.* at 11, 13 (findings 45, 50, 52). The second supplemental agreement, which altered Refrigerated's liability under the notes, was drafted by Kroblin's ICC practitioner, Paul Rhodes. *Id.* at 39. Rhodes also participated in Bowes, Millner's drafting of ICC documents. App. at 243–44. In connection with these documents, the district court found that "Kroblin hired Bowes, Millner to oversee the practitioner's work rather than to act as a substitute for him." *Kroblin,* slip op. at 38–39. Finally, no evidence demonstrates that Millner drew on confidential information when suggesting that Kroblin personally guarantee the transaction. In this context, we note that Rhodes drafted the second supplemental agreement and did not insert a personal guarantee by Allen Kroblin into the contract. *See* app. at 645, ¶ 1.1.

### VII.

Refrigerated also challenges the efficacy of Pitterich's tender of the Fleetwood notes to satisfy Pitterich's debt to Refrigerated incurred prior to the March 17 sales agreement. The contention is that Pitterich could assign only ACE notes, and not Fleetwood notes, to satisfy the debt. To resolve this issue, it is necessary to determine whether the assignment clause in the pledge agreement was ambiguous. The district court found ambiguity and resorted to extrinsic evidence to interpret the clause. Refrigerated asserts that this was error. The assignment clause provided:

Pitterich may assign and KRX [Refrigerated] shall accept notes or accounts receivable of A.C.E. Freight, Inc. in the amount of One Hundred Ninety Thousand Dollars ($190,000.00) in partial repayment of Pitterich's obligation to KRX under the Note.

App. at 793, ¶ 3. Refrigerated contends that the clause had only one meaning—that Pitterich could assign only ACE notes to satisfy Pitterich's debt.

The pledge agreement had a choice of law clause directing that it be construed according to Iowa law. App. at 800, ¶ 13. Under Iowa law, contract language is ambiguous if it is equivocal and thus susceptible of more than one meaning. *M–Z Enterprises v. Hawkeye-Security Insurance Co.,* 318 N.W.2d 408, 413 (Iowa 1982). Determining whether contract terms are ambiguous is a question of law subject to plenary review. *Id.* at 413; *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980); *Universal Minerals,* 669 F.2d at 102. Because the assignment clause is unclear as to whether Pitterich could assign to Refrigerated notes from entities other than ACE, the district court properly concluded that the assignment clause was ambiguous.

The fact finder interprets ambiguous terms in a contract by looking to the circumstances surrounding the transaction to determine the intent of the parties. *I.G.L. Racquet Club v. Midstates Builders, Inc.,* 323 N.W.2d 214, 216 (Iowa 1982); *M–Z Enterprises,* 318 N.W.2d at 412–13 (citing Restatement (Second) of Contracts § 212 (1979)). These interpretations are findings of fact which are subject to reversal only if they are clearly erroneous. *John F. Harkins Co. v. Waldinger Corp.,* 796 F.2d 657, 659–60 (3d Cir.1986); *Ram Construction Co. v. American States Insurance Co.,* 749 F.2d 1049, 1053 (3d Cir.1984).

■ Here, the district court's interpretation of the parties' intent as to the contract terms was consistent with the evidence. Refrigerated and Pitterich designed the pledge agreement to enable Pitterich to obtain all of Fleetwood's stock

so that he could sell it to Refrigerated. To accomplish this, Refrigerated provided $200,000 to Pitterich so that he could forward the money to ACE to buy out Loudermilk's interest. The parties anticipated that Pitterich would receive a note from ACE which he would then assign to Refrigerated after the sale was completed, ultimately making ACE liable to Refrigerated, its new owner. Under the pledge agreement, Refrigerated could not demand repayment until after May 1, 1977, the date by which the parties believed the transaction would be consummated. As it worked out, the transaction never was consummated and Refrigerated demanded repayment in July 1979.

To reflect funds advanced to ACE, Pitterich received a note from Fleetwood. Although this was an accounting treatment that the parties to the pledge agreement never anticipated, the funds were, nevertheless, employed as had been agreed—to buy out Loudermilk's interest in ACE. *Kroblin,* slip op. at 10 (finding 38). Thus, there is no reason why Refrigerated should not accept the Fleetwood note as payment for the Pitterich loan. Both parties intended this result, whether the note bore the name of ACE or Fleetwood. We thus reject these and other Refrigerated arguments that Pitterich's tender was improper.

### VIII.

We now turn to Pitterich's cross appeal. He contends that the district court erred in finding the noncompetition agreement unenforceable for want of consideration. Pitterich's major premise is that the March 17 sales agreement and the noncompetition agreement were executed contemporaneously and that "[t]he consideration for payment of [$100,000] to Pitterich included not only 'noncompetition' but also the sale of Pitterich's interest in Fleetwood/ACE and the execution of the other agreement on the same date." Br. for appellant at 13. Pitterich relies on *Richter v. Mozenter,* 356 Pa. 650, 53 A.2d 76 (1947), for the proposition that an agreement executed contemporaneously with the execution of another

agreement may provide sufficient consideration for both agreements. Kroblin responds that the agreement of sale and the noncompetition agreement were complete and integrated memoranda of the terms of separate contracts between the parties referring to the two separate transactions: one a sale of a transportation company; the other a personal covenant not to compete. Br. for appellee at 44. Kroblin relies on the statement in the sales agreement indicating that it was the sole agreement between the parties, except as modified by subsequent amendments:

> This Agreement supersedes and cancels all prior letters or intent, agreements, understandings, offers and assurances, oral or written, of any PARTY, and shall be the sole agreement with respect to the matters involved, except as may be agreed to by subsequent amendments.

App. at 585, ¶ 8.5.

If we accept Kroblin's contention, we would have to agree that Pennsylvania's parol evidence rule prohibits Pitterich from varying the terms of the noncompetition agreement by reference to terms of the sales agreement. The district court considered them to be separate transactions. With respect to the noncompetition agreement, it held that "Pitterich made an illusory promise since he could freely choose not to perform his side of the bargain and still collect the full amount of money." *Kroblin,* slip op. at 32. Review of the issue is plenary. *Universal Minerals,* 669 F.2d at 102.

### A.

It is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties. *Von Lange v. Morrison-Knudsen Co.,* 460 F.Supp. 643, 647–48 (M.D.Pa.1978), *aff'd mem.,* 609 F.2d 504 (3d Cir.1979); *Shehadi v. Northeastern National Bank,* 474 Pa.

232, 236, 378 A.2d 304, 306 (1977); *International Milling Co. v. Hachmeister, Inc.,* 380 Pa. 407, 417–18, 110 A.2d 186, 191 (1955). We believe that the circumstances in this case require that we examine the agreements to ascertain if the noncompetition agreement was incorporated by reference into the main purchase agreement by language in either instrument, notwithstanding the seemingly express disclaimer in ¶ 8.5. We find several passages in both agreements that are extremely significant.

First, it is undisputed that two agreements were entered into simultaneously:

> WHEREAS, Purchaser and Seller have, simultaneously with the execution of this Agreement, entered into an Agreement whereby Seller has agreed to sell, and Purchaser has agreed to buy, subject to all prior requisite governmental approvals, all of Seller's right, title, and interest to all of the issued and outstanding shares of capital stock of FLEETWOOD INVESTMENT COMPANY ("Fleetwood"), a Michigan corporation, subject to the terms of said Agreement, and through such purchase, Purchaser would acquire control of A.C.E. FREIGHT, INC. ("A.C.E.").

App. at 803. Moreover, ¶ 1 of the noncompetition agreement makes a second reference to the contemporaneous execution, referring to "the contemporaneously executed agreement relating to the purchase-sale of capital stock between the parties." *Id.* at 804.

Second, the noncompetition agreement was considered a *sine qua non* of entering into the agreement of sale:

> WHEREAS, Purchaser would not enter into said Agreement with Seller to purchase his shares of capital stock of Fleetwood, and, in turn, to control A.C.E., unless Purchaser was afforded a reasonable opportunity to continue the business of A.C.E. and the opportunity to retain the customers of A.C.E. without the competition of Seller in the same territory with customers with which he has had long business relationships.

*Id.* at 803–04. Finally, it is evident from the purchase agreement that the parties sought to protect ACE's business from erosion by subsequent events. In ¶ 2.6, the parties agreed that there would be no "transaction, contract, agreement, lease or mortgage substantially adversely affecting the value of [Fleetwood's] business, assets, or properties...." *Id.* at 576.

 Faced with these formidable pronouncements, we conclude as a matter of law that both agreements were inexorably associated with the same transaction: Pitterich's sale of Fleetwood to Kroblin. In light of the simultaneous execution, the cross reference that the sale of the company would not go forward absent the Pitterich noncompetition agreement, and the above-cited passage in the purchase agreement, we hold that no single writing embodied the whole of the parties' agreement and thus both written agreements should be construed together. *See Kingston Dodge, Inc. v. Chrysler Corp.,* 449 F.Supp. 52, 54 (M.D.Pa.1978). The parol evidence rule does not prevent consideration of the noncompetition agreement in conjunction with the sale. *See International Milling Co.,* 380 Pa. at 417–18, 110 A.2d at 191 (presence of an integration clause does not mandate application of the parol evidence rule when the writing does not fully express the essential elements of the transaction); *Neville v. Scott,* 182 Pa.Super. 448, 452, 127 A.2d 755, 757 (1956) (where two agreements are made as part of one transaction they will be read together to express the essential elements of the parties' undertaking, notwithstanding the presence of an integration clause in the second agreement). *Accord Chertkof v. Spector Baltimore Terminal, Inc.,* 263 Md. 550, 557–58, 284 A.2d 215, 219 (1971) (collateral agreement is admissible despite parol evidence rule or an integration clause if that agreement is separate and distinct from original contract, is consistent with provisions of that contract, and could not reasonably be expected to be embodied in the main contract). Our analysis then compels the conclusion that the noncompetition agreement is enforceable by Pitterich. Because it was

an integral part of the sales agreement, Kroblin's promise to pay Pitterich $100,000 was supported by adequate consideration, to-wit, Pitterich's sale of his interest in Fleetwood and the execution of the purchase agreement on the same date. Accordingly, we will reverse the district court's determination to the contrary.

## IX.

In its order of October 11, 1985, the district court ordered Kroblin Transportation and Refrigerated to pay the Lakes and McCormick notes, plus interest "at the legal rate." *Kroblin Refrigerated Xpress, Inc. v. Pitterich,* Nos. 80–209, 81–574 (W.D.Pa. Oct. 11, 1985), *reprinted in* app. at 56–57. Doyle and Ortbring have appealed from the final judgment following that order, as has Rickards, as executrix of the estate of E.C. McCormick. In an order dated May 5, 1986, the district court amended its October 11 order to specify that the "legal rate" of interest in its first order referred to the Pennsylvania six percent per year prejudgment interest rate found at 41 Pa.Consol.Stat. § 202. *Kroblin Refrigerated Xpress, Inc. v. Pitterich,* Nos. 80–209, 81–574 (W.D.Pa. Oct. 11, 1985), *reprinted in* supp. app. at 1–4. Doyle and Ortbring have appealed from the May 5 order. Because these appeals are identical, we will treat them together. Doyle, Ortbring, and Rickards would have the district court apply the higher rates of prejudgment interest available under the law of Michigan and ask us to reverse the district court's holding to the contrary.

 We need not consider appellants' argument here, however, for Doyle, Ortbring, and Rickards did not effectively raise the prejudgment interest rate issue until their appeals to this court.[1] In keeping with our general rule that we will not consider belatedly presented issues, absent "horrendous cases where a gross miscarriage of justice would occur," we will not notice this issue in the present case. *See Newark Morning Ledger Co. v. United States,* 539 F.2d 929, 932 (3d Cir.1976). Even had the issue been properly preserved, the result still would have been the same. No party, including Doyle, Ortbring, and Rickards, challenges the application of Pennsylvania law to the underlying controversy. Because prejudgment interest is a component of contract damages, under the teachings of Pennsylvania choice of laws rules, we are satisfied that the Pennsylvania prejudgment interest rate does apply. *See Knauer v. Knauer,* 323 Pa.Super. 206, 213–16, 470 A.2d 553, 557–58 (1983); Restatement (Second) of Conflict of Laws § 207 (1969); *see also id.* comment e; *Daset Mining Corp. v. Industrial Fuels Corp.,* 326 Pa.Super. 14, 35, 473 A.2d 584, 594–95 (1984); Restatement (Second) of Contracts § 354 (1979). Accordingly, no "gross miscarriage of justice" is presented here to persuade us to consider Doyle, Ortbring, and Rickards' untimely arguments. Therefore, we will affirm the district court's application of the Pennsylvania six percent legal rate of prejudgment interest to the Lakes and McCormick notes.

## X.

The judgment of the district court will be affirmed except for that part of its order

---

**1.** Although this issue was the subject of a post-trial motion under Rule 60(a) of the Federal Rules of Civil Procedure, that motion did not properly place it before the district court. Unlike a request for the addition of improperly omitted prejudgment interest, which is a mere "clerical error" correctible under Rule 60(a), *Barris v. Bob's Drag Chutes & Safety Equip.,* 717 F.2d 52, 55 (3d Cir.1983), appellants' motion argued the choice of law to govern the prejudgment interest rate. This type of argument is not the proper subject of a Rule 60(a) motion. *See Morgan Guaranty Trust Co. v. Third Nat'l Bank of Hampden County,* 545 F.2d 758 (1st Cir.1977) (argument on date from which prejudgment in-

terest should run was improper subject of Rule 60(a) motion); *Warner v. City of Bay St. Louis,* 526 F.2d 1211 (5th Cir.1976) (argument on proper rate of prejudgment interest was improper subject of Rule 60(a) motion). Accordingly, Doyle, Ortbring, and Rickards' Rule 60(a) motion did not properly raise the choice of law question in the district court. Moreover, even had a Rule 60(a) motion been the appropriate vehicle by which to raise it, there is a very serious question whether we could still notice it, for we have held that a failure to raise an issue at trial may not be cured by raising it in a post-trial motion. *Caisson Corp. v. Ingersoll-Rand Co.,* 622 F.2d 672, 681 (3d Cir.1980).

denying Wernert Pitterich's claim for $100,000. We will reverse so much of the district court's order that denied Wernert Pitterich's claim for $100,000 and remand this cause for further proceedings in accordance with the foregoing.

Costs taxed against the Kroblin parties for their relevant appeals and against Doyle, Ortbring, and Rickards for the prejudgment interest appeal.