**In re WEST CHESTNUT REALTY OF HAVERFORD, INC., Debtor.**

**Bankruptcy No. 93–15996 SR.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 27, 1995.

Frederic J. Baker, Asst. U.S. Trustee, Philadelphia, PA.

Charles M. Golden, Edmond M. George, Obermeyer, Rebman, Maxwell & Hippel, Philadelphia, PA.

Francis J. Lawall, Pepper, Hamilton & Scheetz, Philadelphia, PA.

Joanne Semeister, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA.

Bonnie Glantz Fatell, Blank, Rome, Comisky & McCauley, Philadelphia, PA.

Herman P. Weinberg, Herman P. Weinberg & Associates, P.C., Philadelphia, PA.

### OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### Introduction.

Before the Court is the Motion of V. DiFrancesco and Sons ("DiFrancesco") to have the Court estimate an unsecured claim it asserts against the above-named Debtor, West Chestnut Realty of Haverford, Inc. ("West Chestnut") pursuant to 11 U.S.C. § 502(c)(1), and thereafter allow the same for the limited purpose of voting on West Chestnut's currently pending Third Amended Plan of Reorganization. The subject claim has been objected to in its entirety by West Chestnut, whose objection is supported by the Official Committee of Unsecured Creditors (the "Committee"). An evidentiary hearing was held on January 9, 1995. On the basis of the record made and the arguments of counsel, the Court has concluded that DiFrancesco's unsecured claim must be disallowed. In the opinion of the Court, however, this disposition may represent a Pyrrhic victory for West Chestnut because, for the reasons hereinafter discussed, it may render West Chestnut's pending plan of reorganization unconfirmable.

### Background.

West Chestnut owns and operates a landfill in Delaware County, Pennsylvania known as the Lanarch Quarry (the "Property"). It purchased the Property from DiFrancesco in 1982 for $1,000,000. The purchase price consisted of a $35,000 down payment and a $965,000 purchase money mortgage. At or

about the time West Chestnut bought the Property from DiFrancesco, those two parties and a related corporate entity owned by or affiliated with the principals of West Chestnut, Crocket Mortgage Company, entered into a certain stock option agreement (the "Stock Option Agreement") pursuant to the terms of which DiFrancesco was granted what was essentially a thirty year option to acquire a twenty (20%) percent interest in the Property and West Chestnut's business for the nominal sum of $500. Pre-bankruptcy corporate counsel for DiFrancesco testified that the option feature was an integral part of the sale transaction and that the potential for DiFrancesco to participate in appreciation of the business or Property was an important factor in DiFrancesco's agreement to the basic $1,000,000 purchase price. Copies of the Stock Option Agreement, as amended, were introduced in these proceedings as Exhibits M–1 and M–2. As an alternative to payment upon DiFrancesco's exercise of the option, the Stock Option Agreement required certain compensation to be paid to DiFrancesco upon the occurrence of various specified events including, *inter alia*, 1) any election by West Chestnut to terminate DiFrancesco's rights under the Stock Option Agreement prior to their expiration, 2) sale by West Chestnut of the Property or certain ownership interests in the entity operating the Property, and 3) commencement of sanitary land fill operations on the Property. It is duly noted that none of these "events" had obtained as of the commencement of this Chapter 11 case on October 14, 1993.

West Chestnut has scheduled the Stock Option Agreement as an executory contract on the Bankruptcy Schedules filed by it in this case. On October 21, 1994, DiFrancesco filed an unsecured Proof of claim in the amount of $2,600,000 relative to its rights under the Stock Option Agreement. DiFrancesco styles this claim as one for rejection damages for termination of an executory contract. West Chestnut's plan of reorgani-

zation makes no specific mention of the Stock Option Agreement, but DiFrancesco observes correctly, that both the Third Amended Disclosure Statement and Plan of Reorganization provide for the automatic rejection of all executory contracts not specifically assumed by the Debtor on or before the Confirmation date of the Plan. On November 21, 1994, West Chestnut filed an Objection to DiFrancesco's unsecured Proof of Claim, which objection recites, as follows:

2. The Claim is objectionable on a number of grounds, including:

a. The Claim was filed after the bar date of March 30, 1994;

b. the Claim is based upon a "rejection" which rejection, as a matter of law, is not cognizable under the bankruptcy court; (sic)

c. the Claim is speculative, contingent and unliquidated; and

d. the Claim if any, the existence of which is specifically denied, is grossly overstated.[1]

While no hearing was ever specifically held with respect to West Chestnut's Objection to the DiFrancesco Claim, West Chestnut has proceeded to move its Third Amended Plan of Reorganization along the road to confirmation. This has prompted DiFrancesco to file the instant Motion requesting estimation and allowance of its unsecured claim for purposes of voting on the proposed Plan of Reorganization. That Motion, as noted, is now before the Court for adjudication.

### Discussion.

■ West Chestnut's first objection to DiFrancesco's claim is easily dispatched. West Chestnut's proposed Disclosure Statement and Plan of Reorganization call for rejection damage proofs of claim to be filed within thirty (30) days from the date of the rejection of an executory contract. As there has been no previous "rejection" of the Stock Option Agreement this date in the present case cannot have passed. Hence, the Court rejects

---

1. In light of West Chestnut's Objections to DiFrancesco's claim, and since West Chestnut's proposed Plan of Reorganization makes no specific provision for DiFrancesco's claim relative to the Stock Option Agreement, the Court assumes that West Chestnut intends that DiFrancesco's rights under the Stock Option Agreement will simply be extinguished upon confirmation of its Plan of Reorganization.

any argument going to the timeliness of DiFrancesco's Proof of Claim. West Chestnut's remaining three objections are to one degree or another related and will therefore be discussed as one.

■ Although the Bankruptcy Code contains no definition of the phrase executory contract, the Third Circuit Court of Appeals in *Sharon Steel Corporation v. National Fuel Gas Distribution Corporation*, 872 F.2d 36 (3rd Cir.1989) adopted what is sometimes referred to as "the Countryman test" after Professor, and noted Bankruptcy Commentator, Vern Countryman. *See Countryman Executory Contracts in Bankruptcy, Part I*, 57 Minn.L.Rev. 439, 460 (1973). This test, which has been widely followed throughout the circuits, suggests:

> "[An Executory Contract is] a contract under which the obligation of both the bankrupt and the other party to the contract are so for unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Sharon Steel*, 872 F.2d at 39.

Case law has fairly well established the proposition that stock option agreements are generally executory contracts within the ambit of 11 U.S.C. § 365 and the foregoing test. This Court accordingly, and with little hesitation concludes that the Stock Option Agreement in this case must be so viewed. *See In re Allvend Industries, Inc.*, 2 BCD 29 (Bankr. S.D.N.Y.1975); *In re Parkwood Realty Corp.*, 157 B.R. 687 (Bankr.W.D.Wash.1993) The difficulty in this instance lies in quantifying DiFrancesco's damages from the rejection of the Stock Option Agreement, if any. The Stock Option Agreement sets forth a basis for liquidating DiFrancesco's monetary claim upon the occurrence of different events. However, none of these "events," which would have yielded a ready answer to the question, had occurred as of West Chestnut's bankruptcy petition filing date, nor have any since occurred. This problem calls into play West Chestnut's objections as set forth in subparagraphs c and d above; that is, that DiFrancesco's claim is speculative, contingent, unliquidated and/or grossly overstated. This argument is not wholly without

merit. It is true that the triggering events under which DiFrancesco would receive something from West Chestnut, even absent DiFrancesco's own affirmative exercise of the subject stock option, have not occurred. DiFrancesco recognizes this, but has nevertheless suggested that the Court can utilize one or another of the provisos of the Stock Option Agreement for purposes of liquidating its claim.

■ For example, DiFrancesco suggests that the Option termination of price of $2,620,000 as contained in the June 1, 1988 amendment to the Stock Option Agreement (Exhibit M–2) would be appropriate. Obviously this is the figure which DiFrancesco itself had in mind when completing its unsecured proof of claim. This figure is at the high end of DiFrancesco's valuation spectrum.

Alternatively, DiFrancesco has invited the Court to consider testimony offered at the January 9, 1995 hearing from a business valuation consultant, which testimony was designed to demonstrate a range of possible values for the business of West Chestnut based upon industry averages, certain assumptions as to West Chestnut's expected future growth in revenues, and an appropriate interest discount rate. Arguing that the consultant's figures represent what an arms length investor would pay for the business of West Chestnut, DiFrancesco urges the Court to liquidate its claim by using these values and applying the provisions of the Stock Option Agreement which call for payment to DiFrancesco of twenty (20%) percent of the purchase price upon transfer of the Property or the business. Using the consultant's various projected valuations produces a claim range (based on a 20% entitlement) from –0– to approximately $1,140,000.

Having considered the testimony and documentary evidence presented with respect to both of the foregoing alternatives, the Court rejects both. Indeed, the Court concludes that, because none of the relevant events have occurred, and might never occur, utilizing either of the suggested concepts as a measure to calculate DiFrancesco's damages for rejection of the Stock Option Agreement

would produce an inappropriate windfall to DiFrancesco.

A third alternative DiFrancesco offers is to have the Court resort to a hypothetical post-confirmation balance sheet of West Chestnut as of October 31, 1994, as the means of predicting a reasonable hypothetical purchase price for the Property or West Chestnut's business. This balance sheet (Exhibit M–3 at Page 4) purports to reflect Stockholders equity in the amount of $1,400,078 on October 31, 1994, after giving effect to an appraisal value for the Property and to a refinancing contemplated under the Debtor's Third Amended Plan of Reorganization. Assuming, arguendo, that a purchaser of the business would be willing to buy this "equity" even-up, and taking twenty (20%) of this hypothetical purchase price, produces a DiFrancesco claim value of approximately $280,000, which figure is towards the low end of the range of claim values suggested by DiFrancesco. There are several problems with this suggestion, not the least of which are that the contemplated refinancing has not yet occurred, nor has the Debtor's Plan of Reorganization been confirmed. Aside from this, however, West Chestnut argues that the hypothetical "post-confirmation" balance sheet fails to take into consideration the existence of approximately $2,000,000 in additional unsecured debt held by insiders of West Chestnut. If this sum is treated as debt and factored into the balance sheet, it eliminates the $1,400,078 stockholders equity. Indeed, West Chestnut as of that date would be insolvent, arguably rendering its equity interests worthless. DiFrancesco agrees with this arithmetic, however, DiFrancesco argues that the Court should consider the insider debt as equity infusions, or otherwise subordinate that debt to DiFrancesco's rights, thus taking it out of consideration in the present context. Compounding this collateral dispute is the fact that the parties are somewhat at odds over precisely what agreements were or were not reached with respect to the character of the insider loans at the hearing of January 9, 1995. West Chestnut and the Committee assert that DiFrancesco has waived any rights to contest the bona fides of the insider loans. DiFrancesco disputes this, but argues that if there is ambiguity on the point, DiFrancesco would be happy to file a motion to reopen the record and have the issue be revisited. For the reasons hereinafter discussed, the Court finds that to be unnecessary.

Giving DiFrancesco the benefit of the doubt with respect to the insider loans issue, and thereby accepting that West Chestnut's hypothetical balance sheet as of October 31, 1994, would reflect stockholder's equity of $1,400,000, will still, in the Court's view, produce an unsatisfactory windfall for DiFrancesco. In the first place, under 11 U.S.C. § 502(b), the Court is charged to determine the amount of claims against the bankruptcy estate *as of the date of the filing of the Petition,* not as of a date a year later. Having said that, the Court is quick to add, that even if one were to make the not unreasonable assumption that, if the insider debt were to be subordinated, a hypothetical balance sheet of West Chestnut as of October 31, 1994, would resemble West Chestnut's actual balance sheet as of the date of the filing of its bankruptcy petition on October 14, 1993, the proposed formula for calculation of DiFrancesco's damages would still remain unacceptable. This is, again, because the events which would trigger DiFrancesco's entitlement to be paid the sum produced by this formula, or any other amount, have never occurred, and might never in fact occur. Under these circumstances, the only definite damage which the Court can discern to flow from the rejection of the Stock Option Agreement is DiFrancesco's entitlement to exercise the stock option and thereby acquire 20% of the reorganized debtor for the sum of $500.

The foregoing dilemma indirectly calls into play West Chestnut's objection as set forth in subparagraph b. above; to wit: that the instant rejections is not one "cognizable under the Bankruptcy Court" (sic). Having considered this argument, the Court must disagree.

It is axiomatic that for every right there exists a remedy. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 162–63, 2 L.Ed. 60 (1803). If the Stock Option Agreement is to be rejected, it is the Court's obligation to determine the extent of DiFrancesco's injury. In this regard, the Court acknowledges what

the parties themselves already know: that DiFrancesco's rights under the Stock Option Agreement are difficult, if not impossible, to quantify at this juncture. It surely does not follow from this, however, that DiFrancescio's "contingent equity interest," (as West Chestnut itself has described DiFrancesco's "rights" under the Stock Option Agreement in its Answer to DiFrancesco's Motion to Estimate Claim) is without value and may simply be extinguished by West Chestnut without compensation, particularly where the current principals of West Chestnut will retain their equity interests, as is contemplated under the third Amended Plan of Reorganization.

■■■ The measure of the damages of a party to a rejected executory contract is a question of state law. *In re Besade,* 76 B.R. 845 (Bankr.M.D.Fla.1987). Such damages are not necessarily limited exclusively to monetary damages. *In re Aslan,* 65 B.R. 826 (Bankr.C.D.Calif.1986). In this respect, the discussion in *In re Walnut Associates,* 145 B.R. 489 (Bankr.E.D.Pa.1992) is helpful. Rejection of an executory contract means that the non-debtor party cannot make an administrative claim against the Debtor's estate. If the debtor fails to fulfill its obligations under the subject contract the non-debtor party to the contract is limited in its claims for the breach to the treatment accorded to the debtor's general unsecured creditors; *unless specific performance is available to the non-debtor party under applicable state law. Id.* at 494. If State law does authorize specific performance under a rejected executory contract the non-debtor should be able to enforce the contract against the debtor irrespective of the Debtor's rejection. In considering whether a rejected contract can be enforced against the Debtor the emphasis should be on whether the contract's terms are specifically enforceable under State law rather on the happenstance of "executoriness." Id. at 495.

In this instance, the Court is convinced that specific performance is a remedy which would clearly be available to DiFrancesco if an action to enforce the Stock Option Agreement were to have been brought in State Court. DiFrancesco's rights under the Stock Option Agreement cannot be separated from West Chestnut's ownership of the underlying realty upon which it operates its landfill business. It is the right to a continuing ownership interest in that realty that the Stock Option Agreement ensures DiFrancesco. The ownership of realty is the classic case where the law considers the rights of a contracting party to be unique and thus unsusceptible to the calculation of monetary damages. *Payne v. Clark,* 409 Pa. 557, 559, 187 A.2d 769, 770 (1963), citing *Borie v. Satterthwaite,* 180 Pa. 542, 37 A. 102 (1897); and *Agnew v. Southern Ave. Land Co.,* 204 Pa. 192, 53 A. 75202003605 (1902). West Chestnut, here, proposes to preserve its own ownership interest in the realty but would apparently propose to extinguish the inchoate right to a future ownership interest on the part of DiFrancesco. No compelling argument to permit this inequitable treatment has been advanced.

At first blush this proposed course of action, if nothing else, seems patently discriminatory. West Chestnut's argument to the contrary, in this regard, hinges on the fact that under the proposed Third Amended Plan of Reorganization the existing stockholders of West Chestnut are going to guaranty West Chestnut's obligations, *vis a vis,* the refinance of its present secured indebtedness. Thus, West Chestnut argues, they are entitled to preferred treatment. This argument fails to persuade because, among other reasons, the value of the Guarantys cannot be ascertained. Indeed, if West Chestnut's future revenue projections are accurate, there would appear to be slim exposure on these Guarantys.

■■ Furthermore, if the proposed treatment of DiFrancesco (i.e., the extinguishment of its contingent equity interest) is not outright discrimination, then it appears to violate the absolute priority rule, which provides that junior classes may take nothing under a plan or reorganization until all senior classes have been paid in full. There is no class junior to that of the equity holders of a corporate debtor. Accordingly, the only way that the existing stockholders of West Chestnut can retain their interests is if DiFrancesco is unimpaired under the proposed plan of

reorganization, or if West Chestnut qualifies the plan under the "new value" exception to the absolute priority rule. In this Court's view, the extinguishment of DiFrancesco's contingent equity interest clearly impairs DiFrancesco. Conversely, the only thing in the nature of new value which as been proposed by the existing stockholders under the Third Amended Plan of Reorganization is their guaranty of West Chestnut's refinance obligations. Numerous courts have questioned whether a guaranty alone can constitute "new value" sufficient to satisfy the requirements of the new value exception. *Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351, 1362 (7th Cir.1990) With those holdings this Court agrees.

█ When a court cannot arrive at a legal measure of damages with a sufficient degree of certainty, no adequate remedy at law exists. *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96 (3d Cir.1986). That situation exits here. Specific performance may be granted by a court of equity in its discretion if there is no adequate remedy at law. *Id.* at 103. This is a Bankruptcy case, however, and not an action upon the Stock Option Agreement in State Court. It is clearly not this Court's role to specifically direct that the Debtor propose a plan of reorganization which preserves DiFrancesco's rights under the Stock Option Agreement and it will certainly not do so. However, the upshot of the foregoing analysis returns the Court to its earlier observation concerning a Pyrrhic victory for West Chestnut. Under the circumstances, the Court will disallow DiFrancesco's unsecured claim for monetary damages occasioned by rejection of the Stock Option Agreement. By the same token, however, the Court must indicate here that it perceives no future for a proposed Plan of Reorganization which contemplates the automatic extinguishment of DiFrancesco's option rights without more. On the contrary, if agreeable termination damages cannot be arrived at, the Court is convinced that the proper result under the Bankruptcy Code will be for DiFrancesco's rights under the Stock Option Agreement to simply pass through this Chapter 11 case unaffected, in the manner described in *In re Walnut Associates, supra.* The foregoing

does not bode well for the Plan of Reorganization West Chestnut now has before the Court, however, the ultimate outcome of this observation, at this juncture, must remain to be seen.