**In re RESORTS INTERNATIONAL, INC.; Resorts International Financing, Inc.; Griffin Resorts, Inc. and Griffin Resorts Holding, Inc., Debtors.**

Bankruptcy Nos. 89–10119, 89–10120, 89–10461 and 89–10462.

United States Bankruptcy Court, D. New Jersey.

June 3, 1996.

---

Dechert, Price & Rhoads by Robert A. Baime, New York City, for Debtors.

Bressler, Amery & Ross, P.C. by David H. Pikus, Michael J. Connolly, Florham Park, NJ, for J. Louis Binder, Trustee of Resorts International Litigation Trust.

## OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

This matter comes before the Court on a Verified Application by Resorts International, Inc.[1] and related entities (collectively "Resorts") for entry of an order pursuant to Sections 1142(b) and 105(a) authorizing and approving distribution of accrued interest from the Resorts International Litigation Trust to Resorts (the "Application"). A hearing at which this Court reserved decision was conducted on September 21, 1995. The following constitutes this Court's findings of fact and conclusions of law.

## FACTS

On or about November 12, 1989, involuntary petitions were filed against Resorts International, Inc. ("RII") and Resorts International Financing, Inc. ("RIFI"). On December 22, 1990, RII and RIFI consented to the entry of an order for relief pursuant to Chapter 11 of the Bankruptcy Code. On that same date, Griffin Resorts Inc. ("GRI") and Griffin Resorts Holding, Inc. ("GRHI") filed separate voluntary petitions under Chapter 11 of the Bankruptcy Code. Upon application of the Debtors, on December 22, 1989, this Court entered an order directing the joint administration and consolidation for administrative purposes only of the RII, RIFI, GRI and GRHI Chapter 11 cases.

By Order dated August 28, 1990, this Court confirmed the Second Amended Joint Plan of Reorganization for the collective debtors (the "Plan"). Pursuant to Section 7.10 of the Plan and the Litigation Trust

---

**1.** Resorts International, Inc. changed its name as of June 30, 1995, to Griffin Gaming & Entertainment, Inc. However, for purposes of this Opinion, the Court will refer to the movant as Resorts International, Inc. or RII.

Agreement, which was entered into by the parties on or about September 17, 1990 and annexed as Exhibit 1.46 to the Plan, the Litigation Trust was created for the benefit of certain of Resorts' creditors. The beneficial interests in the Litigation Trust were divided into 10,000,000 Litigation Trust Units and allocated to certain creditors (the "Unitholders") [2] pursuant to a formula set forth in Section 7.10(b) of the Plan. Each Litigation Trust Unit entitled its holder to a *pro rata* share of any distribution from the Litigation Trust. *See* Section 7.10(d) of the Plan.

The Litigation Trust, *inter alia,* was empowered to prosecute various claims and causes of action (the "Litigation Claims") held by the Debtors and certain of their affiliates against Donald J. Trump ("Trump") and affiliated entities ("Trump Parties") arising from the leveraged buyout of the Taj Mahal by Trump from Resorts in 1988. The Litigation Claims were assigned to the Litigation Trust upon its formation. Representatives of the Unitholders elected Kenneth R. Feinberg ("Feinberg") as the Litigation Trustee, pursuant to an Order of the Bankruptcy Court entered on April 17, 1990. Thereafter, by Order dated August 17, 1994, J. Louis Binder ("Binder"), the Successor Trustee, was chosen to replace Feinberg as Litigation Trustee.

Pursuant to the Plan and Litigation Trust Agreement, Resorts was required to make available $5,000,000 to the Litigation Trust to be used to prosecute or otherwise liquidate the Litigation Claims which the Debtors assigned to the Litigation Trust and to fund other Litigation Trust expenses. Section 7.10(a) of the Plan required Resorts to secure this obligation by furnishing an irrevocable letter of credit for the benefit of the Litigation Trust in the sum of $5 million.[3]

On or about October 1, 1990, Resorts and the Litigation Trustee entered into a Deposit Agreement whereby Resorts was permitted to deposit $5 million in cash in lieu of the $5 million letter of credit originally contemplated under the Plan. On or about October 3, 1990, Resorts deposited $5 million cash in a separate expense account in the name of the Litigation Trust to facilitate Resorts' obligation to fund the Litigation Trust's expenses (the "Expense Account"). The Deposit Agreement provides in relevant part:

1. *Deposit.* The Deposit shall be held by the Trustee in an interest bearing account, selected by the Trustee and reasonably acceptable to Resorts, on the terms hereinafter set forth. Within two (2) days of opening such account(s), the Trustee shall notify Resorts, by telecopy, by certified mail return receipt requested or by letter hand delivery, of the name and address of the depository and of each account number.

2. If the requisite Letters of Credit are issued for the account of Resorts and for the benefit of the Trustee, and are delivered to the Trustee, the Trustee shall deliver the balance of the Deposit, *together with interest thereon,* to Resorts in accordance with instructions given by Resorts.

3. Unless and until the Letters of Credit are issued for the account of Resorts and for the benefit of the Trustee, the Trustee shall be entitled to apply the Deposit, *in amounts up to $5,000,000 in the aggregate of all funds so applied,* to pay or reimburse the Trustee for the payment of reasonable expenses of the Litigation Trust as and in the manner provided in Section 7.10(a) of the Plan, and *to apply the balance of such $5,000,000, if any, upon final settlement of all Litigation Claims in the manner provided in Section 7.10(b) of the Plan.*

4. Unless and until the Letters of Credit are issued for the account of Resorts and the benefit of the Trustee, the Trustee may apply up to $3,600,000 of the

---

**2.** The Unitholders were the holders of allowed Class 3B Claims, allowed RII Debenture Claims, and allowed Other Class 3C Claims as defined by the Plan.

**3.** Section 7.10(a) of the Plan provides in relevant part:

On the Initial Distribution Date, New Resorts shall (i) deliver to the Litigation Trustee an irrevocable letter of credit in the amount of $5,000,000 against which drawings may be made for reasonable expenses of the Litigation Trust as and when incurred with the balance, if any, to be drawn upon final settlement of all Litigation Claims; . . . .

Deposit, plus an amount equal to 8% per annum of such amount for the period from September 17, 1990, to the date such amount is so applied to the repayment of the 8% Promissory Note dated September 17, 1990 (the "Promissory Note") made by Resorts payable to the Trustee, which amounts then will be applied in respect of the Special Litigation Trust Units as provided in Section 7.10(d) of the Plan. Any amounts not applied to repayment of the Promissory Note in accordance with Section 7.10(d) of the Plan shall be returned to Resorts.

5. Except as set forth in Paragraph 1 herein, the Trustee shall have no duty to invest all or any portion of the Deposit during any period of time the Trustee may hold the same prior to disbursement thereof and *any disbursements or deliveries of the balance of the Deposit required herein to be made by the Trustee shall be with such interest, if any, as shall have been earned thereon, unless provided otherwise herein or by the Agreement.*

\*　　\*　　\*　　\*　　\*　　\*

8. In the event Resorts fails to procure the required Letter of Credit in the amount of $3.6 million by September 17, 1991, the balance of the Deposit maintained in respect of the Special Litigation Trust Units, up to a maximum of $3,888,000, shall be disbursed by the Trustee as provided in the Section 7.10(d) of the Plan. The remaining balance of the Deposit shall be held and disbursed in accordance with the applicable provisions of the Litigation Trust Agreement and Section 7.10(a) of the Plan.

*See* Deposit Agreement dated October 1, 1990, attached as Exh. C to Resorts Verified Application (emphasis added). Resorts retained the option, which it never exercised, of substituting a letter of credit for the cash deposit at any time prior to settlement of the Litigation Claims.

On May 28, 1991, the Litigation Trustee entered into an agreement with Trump, the Trump Parties and the Debtors settling the Litigation Claims on behalf of the Unitholders in the amount of $12,000,000 (the "Settlement Agreement").[4] Pursuant to Section 7.10(a) of the Plan, disbursements or deliveries of "the balance [of the $5 million letter of credit], if any," was "to be drawn upon final settlement of all Litigation Claims." Similarly, Section 7.10(d) of the Plan provides that "[t]he amount of any undrawn balance of the $5,000,000 letter of credit delivered to the Litigation Trustee as described above shall be added to the amount of any settlements for purposes of [calculating distributions to the Unitholders]."

This Court approved an interim distribution of Litigation Trust assets on February 7, 1994. Pursuant thereto, the Litigation Trustee distributed approximately $14,750,000, representing all of the $12 million settlement proceeds, together with interest income earned thereon, and a portion of the Expense Account balance contributed by Resorts, less $1,250,000 reserved for disputed Unitholder claims and ongoing Litigation Trust expenses. As part of a Settlement Agreement dated May 28, 1991, Feinberg agreed to pay $57,973.71 to Resorts, representing interest income earned on the Expense Account for the period March 16, 1991 through May 28, 1991.

Resorts filed the within motion seeking entry of an order authorizing and approving distribution of accrued interest[5] from the $5 million deposited in the Expense Account.[6] Resorts relies upon several documents in support of its claim to the interest income.

---

4. The Settlement Agreement settled the Litigation Claims on behalf of all Unitholders, subject to the Unitholders' approval. The Unitholders' approval was obtained on July 15, 1991.

5. Marlin E. Anderson, CPA, the accountant for the Litigation Trust, asserts that, from its inception through May 28, 1995, the Expense Account has earned the sum of $716,724.05 in interest. Affidavit of Marlin E. Anderson, ¶ 8.

6. Resorts' original motion also sought entry of an order authorizing and approving distribution of the balance and interest earned on a certain Promissory Note Account to Resorts. At oral argument, the parties agreed to attempt to reach an agreement with regard to monies deposited in the Promissory Note Account. Accordingly, this Opinion does not determine what amount, if any, from the Promissory Note Account should properly be distributed to Resorts.

Resorts points to the December 2, 1992 Report of Independent Accountants (Price Waterhouse) to the Trustee of Resorts' Litigation Trust, which provides in pertinent part:

> Pursuant to the Settlement Agreement, the Trump Parties settled all of the Litigation Claims assigned to the Trust for $12 million. Furthermore, pursuant to Section 7.10(a) of the Plan, Resorts deposited $5 million in a separate expense account held on behalf of Resorts in order to secure Resorts' obligation to fund the Trust's expenses. Under this funding arrangement, *interest earned on the $5 million belongs to Resorts.* The balance of the funds remaining in the Expense Account, after the interest earned on the account is returned to Resorts and the expenses incurred by the Trust are paid in full, is available for distribution to Trust Unitholders pursuant to Section 7.10(d) of the Plan. . . .

Exh. E to Resorts' Verified Application (emphasis added). Price Waterhouse repeated the above-written analysis almost *verbatim* in a January 21, 1994 report it prepared entitled "Resorts Litigation Trust Statement of Cash Receipts and Disbursements For The Year Ending September 30, 1993." *See* Exh. G to Resorts' Verified Application.

Resorts also relies upon certain correspondence between J. Louis Binder (prior to his being appointed as Successor Trustee) and the Majority Litigation Trust Unit Holders Steering Committee. In a November 26, 1993 letter to the Majority Litigation Trust Unitholders Steering Committee, Binder stated:

> The Trust was originally seeded with a $5,000,000 expense fund contributed by RII with any unused portion of this expense fund to be added to a settlement obtained from Trump. In March of 1991 or thereabouts, the Trustee was able to negotiate a settlement of $12,000,000 from Trump. . . . Up until the receipt of the Trump settlement, the Trust had no earnings, as *all interest earned from the Expense Account belongs to RII.*

*See* Exh. H to Resorts' Verified Application (emphasis added).

Resorts also points to the Litigation Trustee's February 7, 1994 application to this Court for Entry of an Order Approving Interim Distribution of Trust Assets ("Interim Distribution Application"). *See* Exh. I to Resorts' Verified Application. The Interim Distribution Application provided in relevant part:

> 15. Finally, an order of this Court is appropriate to confirm the Trust and New Resorts' understanding that the interest earned on the Expense Account and the interest earned on, and the remaining balance in, the Repurchase Account [Promissory Note Account] are not assets of the Trust but rather belong to and will be paid to New Resorts.

Interim Distribution Application, ¶ 15. The Litigation Trust asserts that Paragraph 15 of the Interim Distribution Application was collateral for two reasons: (1) neither the Plan nor the Trust Agreement required the Court's approval before distribution of Litigation Trust assets; and (2) no interest earned on the Expense Account funds was distributed in connection with that Interim Distribution Application.

Finally, Resorts points to a Stipulation and Order Resolving Trust Fund Liability (the "Stipulation and Order") entered into by the Internal Revenue Service (the "IRS") and the Litigation Trust for the years 1990 and 1991. Pursuant to the Stipulation and Order, which was approved by this Court on February 7, 1994, the Litigation Trust was treated as a Grantor Trust and accordingly, the balance remaining in, and interest earned in 1990 on the Expense Account and Promissory Note Account were deemed to be nontaxable to the Trust. The Litigation Trust agreed to pay the IRS $120,000.00 in full satisfaction of the Litigation Trust and Unitholders' tax liability for the 1991 tax year. Resorts asserts that the IRS treatment of the Litigation Trust and Unitholders' tax obligation for the 1990 and 1991 tax years is consistent with a finding that interest earned on the Expense Account and Promissory Note Account belongs to Resorts, and that tax liability to the IRS for interest earned on those accounts resulted only from the $12 million settlement with the Trump Parties. The Litigation Trust asserts, however, that it had no tax liability for interest income be-

cause it is not a taxpaying entity and because the Litigation Trust's deductible expenses have historically exceeded the amount of interest income, on an annual basis.[7] *See* Memo. of Law in Opposition to Application, at 13 n. 6; *see also* Affidavit of Marlin E. Anderson, ¶¶ 4–5.

The Litigation Trust asserts that the interest held in the Expense Account belongs to the Litigation Trust for distribution to Unitholders. In support of its claim of entitlement to interest income on the Expense Account, the Litigation Trust points to Section 7.10 of the Second Amended Joint Plan of Reorganization, which *inter alia* established the Litigation Trust; Article II of the Litigation Trust Agreement, which *inter alia* defines the term "Trust Assets" to include, *inter alia,* "all Litigation Claims," "any assets hereafter acquired by the Trust" and "all proceeds of each of the foregoing (*including, without limitation, any interest earned thereon* ) ..." [emphasis added]; and Paragraph 5 of the Deposit Agreement, which according to the Litigation Trustee, purports to distribute interest income in the same manner as the principal deposit.[8] The Litigation Trust further asserts that, although the former Litigation Trustee made certain statements which allocated the accrued interest to Resorts, those erroneous statements do not defeat the Litigation Trust's entitlement to the accrued interest. The Successor Trustee asserts that his predecessor made a mistake in connection with the various subsequent statements. However, the Successor Trustee asserts that he was merely a consultant to the Litigation Trustee[9] and did not have access to the Foundation Documents at the time that he incorporated statements made by the Litigation Trustee allocating interest income to Resorts into correspondence to the Unitholders. Furthermore, the Successor Trustee asserts

that the purported conflict between the Litigation Trustee's statements and the Foundation Documents supports its position that the Litigation Trustee was mistaken when he allocated the interest income to Resorts. The Litigation Trust asserts that Resorts would be unjustly enriched if it were permitted to capitalize upon a mistake, which it further asserts to have been made as a result of alleged misleading statements by Resorts and its representatives. The Litigation Trust, therefore, frames the issue before the Court as one regarding unjust enrichment and the legal effect of a mistake under New Jersey law.

## DISCUSSION

I. Jurisdiction and Authority of this Court to Provide the Requested Relief

 Sections 105 and 1142(b) of the United States Bankruptcy Code, together with Bankruptcy Rule 3020(d), authorize this Court to enter an order authorizing and approving distribution of accrued interest from the Expense Account. *See generally, In re Jorgensen,* 66 B.R. 104, 108 (9th Cir. BAP 1986) ("The court under §§ 105 and 1142(b) can make necessary orders to carry out the provisions of the plan."). Section 105(a) of the Bankruptcy Code authorizes this Court to "issue any order, process or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." With respect to implementation of a confirmed plan, Section 1142(b) of the Bankruptcy Code provides:

> (b) The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act,

---

7. The Litigation Trust also asserts that Resorts will also be insulated from tax liability in the event this Court finds that Resorts is entitled to the interest income because Resorts has a sizeable net operating loss carryforward. *See* Memo. of Law in Opposition to Application, at 13 n. 6; *see also* Affidavit of Marlin E. Anderson, ¶ 6.

8. The Second Amended Joint Plan of Reorganization, the Litigation Trust Agreement, and the

Deposit Agreement are collectively referred to herein as the "Foundation Documents."

9. Binder asserts that he was "acting as a conduit for information" he received from others, including the former Litigation Trustee, the Chief Financial Officer of Resorts (Matthew B. Kearney), and counsel for the Litigation Trust (Kaye, Scholer, Fierman, Hays & Handler). Binder Affidavit, at ¶ 30.

including the satisfaction of any lien, that is necessary for the consummation of the plan.

11 U.S.C. § 1142(b); *In re Terracor*, 86 B.R. 671, 676 (D.Utah 1988) ("The clear intent of section 1142(b) is for the court to retain its jurisdiction to assure that the terms and provisions of the confirmed Chapter 11 plan are carried out until the plan is completed and a final decree is entered closing the case."). Bankruptcy Rule 3020(d) provides that "[n]otwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate." Accordingly, this Court retains jurisdiction on a continuing basis to oversee those responsible for implementation of a confirmed plan, and to enter appropriate orders to enforce the intent and specific provisions of the plan.

That authority is furthered in this instance by the express terms of the Second Amended Plan confirmed by this Court by order dated August 28, 1990 and the Litigation Trust Agreement entered into by the parties herein on or about September 17, 1990. Section 11.1 of the Plan provides that this Court retained jurisdiction:

(c) To insure that the distributions to Holders of Claims and Interest are accomplished as provided herein;

\* \* \* \* \* \*

(h) ... To hear and determine disputes arising in connection with the Plan or its implementation, including disputes arising under agreements, documents or instruments executed in connection with this Plan;

(i) To construe and take any action to enforce the Plan and issue such orders as may be necessary for the implementation, execution and consummation of the Plan;

(j) ... To hear and determine other issues presented by or arising under the Plan ...

(k) To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

\* \* \* \* \* \*

(o) ... To hear and determine any other matters not inconsistent with Chapter 11 of the Bankruptcy Code; ...

Article VIII of the Litigation Trust Agreement provides that:

The Bankruptcy Court shall retain exclusive jurisdiction over the Litigation Claims and Counterclaims, the Trust, the Trustee and the Trust Assets as provided for in the Plan, including, without limitation, the determination of all controversies and disputes arising under or in connection with this Trust Agreement.

Accordingly, this Court has jurisdiction and authority to provide the requested relief.

## II. Entitlement to Accrued Interest on the Expense Account

The logical starting point for this Court's determination as to which party is entitled to interest income earned on the $5 million deposited in the Expense Account is the initial date of deposit, October 3, 1990. According to Section 7.10 of the Plan, the purpose of the $5 million was to facilitate the prosecution of Litigation Claims against Donald Trump and affiliated entities. According to Section 7.10(d) of the Plan, upon settlement of the Litigation Claims, the "balance of the $5,000,000" deposit was to be made available for distribution by the Litigation Trustee to the beneficiaries of the Trust, the Unitholders. The Litigation Trust settled the Litigation Claims on May 28, 1991.

In order to assist this Court's determination, it is helpful to divide the relevant time period into two segments: the first beginning with the initial $5 million cash deposit (October 3, 1990) and ending on the date immediately prior to settlement of the Litigation Claims (May 27, 1991) (the "Pre–Settlement Period"), and the second beginning on the date of settlement of the Litigation Claims (May 28, 1991) through the present (the "Post–Settlement Period"). The Litigation Trust raises an issue with respect to the time period between March 16, 1991 and May 28, 1991. This time period will be discussed in connection with the Post–Settlement time period.

This Court will discuss the respective parties' entitlement to accrued interest during

these relevant time periods in reverse order, beginning with the Post–Settlement Period and working back in time to the start of the Pre–Settlement Period, the date of the initial $5 million deposit on or about October 3, 1990.

### A. The Post–Settlement Period: May 28, 1991 to Present

■ This Court's determination as to which party is entitled to interest income on the Expense Account depends upon whether the $5 million deposit (or a portion thereof) was an asset of the Litigation Trust at the time interest accrued. With respect to the Post–Settlement Period, the balance remaining in the Expense Account became an asset of the Litigation Trust as of May 28, 1991. The Foundation Documents support the conclusion that the balance remaining in the Expense Account became a "Trust Asset" upon settlement of the Litigation Claims. Article II of the Litigation Trust Agreement defines the term "Trust Asset" to include, *inter alia*, "all Litigation Claims," "any assets hereafter acquired by the Trust" and "all proceeds of each of the foregoing (*including, without limitation, any interest earned thereon*) ..." [emphasis added]. Section 7.10(a) of the Plan provides in relevant part that disbursements or deliveries of "the balance [of the $5 million letter of credit], if any," was "to be drawn upon final settlement of all Litigation Claims." In addition, Section 7.10(d) of the Plan provides in relevant part:

> The amount of any undrawn balance of the $5,000,000 letter of credit delivered to the Litigation Trustee as described above shall be added to the amount of any settlement for purposes of [calculating distributions to the Unitholders].

Similarly, Paragraph 3 of the Deposit Agreement provides in relevant part that "the Trustee shall be entitled ... to apply the balance of such $5,000,000, if any, upon final settlement of all Litigation Claims in the manner provided in Section 7.10(b) of the Plan."

Resorts urges that sections of the Deposit Agreement and Plan support the conclusion that the amount of funds to be drawn by the Litigation Trust was capped at $5 million. Paragraph 3 of the Deposit Agreement provided in part that "the Trustee shall be entitled to apply the Deposit, in amounts up to $5,000,000 in the aggregate of all funds so applied to pay or reimburse the Trustee for the payment of reasonable expenses ... and to apply the balance of such $5,000,000, if any, upon final settlement of all litigation claims...." Section 7.10(a) of the Plan provides that "the balance [of the $5 million letter of credit], if any, [is] to be drawn upon final settlement of all Litigation Claims." Section 7.10(d) of the Plan provides that "[t]he amount of any undrawn balance of the $5,000,000 letter of credit delivered to the Litigation Trustee as described above shall be added to the amount of any settlements for purposes of [calculating distributions to the Unitholders]."

The issue as framed by the Court is whether interest earned on Trust Assets is also an asset of the Trust. Article II of the Litigation Trust Agreement defines "Trust Assets" to include "all proceeds of each of the foregoing [Trust Assets] (*including, without limitation, any interest earned thereon*)...." (emphasis added). Accordingly, interest earned on the balance remaining in the Expense Account is also a "Trust Asset" and therefore, belongs to the Litigation Trust.

### B. The Pre–Settlement Period: October 1990 through May 27, 1991

■ This Court must now determine which party is entitled to interest income earned on the Expense Account during the period prior to settlement of the Litigation Claims. This Court's determination as to which party is entitled to interest income turns upon which party was the owner of the deposited funds during the relevant time period. Stated another way, this Court must determine whether the Expense Account was an asset of the Litigation Trust from the date of the initial deposit on or about October 3, 1990. This determination is critical because the definition of "Trust Assets" contained in Article II of the Litigation Trust Agreement includes interest earned on all Trust Assets. Accordingly, if this Court determines that the Expense Account funds are "Trust As-

sets," which by definition belong to the Litigation Trust, then the interest income earned on the Expense Account must also be allocated to the Litigation Trust.

In support of its argument that the Expense Account is a trust asset, the Litigation Trust points to the fact that the Expense Account was titled, with Resorts' knowledge and consent, solely in the name of the Litigation Trust. Although title on a bank account frequently coincides with ownership of the funds deposited therein, title is not dispositive of ownership. The Litigation Trust's argument that Resorts' failure to object to the title on the account demonstrates that the Expense Account was an asset belonging to the Litigation Trust is outweighed by the terms contained in the Foundation Documents. Accordingly, this Court is satisfied, under all of the facts and circumstances of the case, that the $5 million deposit in the Expense Account were not, on October 3, 1990, "Trust Assets" as defined by Article II of the Litigation Trust Agreement.

Pursuant to Section 7.10 of the Plan and the Litigation Trust Agreement, which was entered into by the parties on or about September 17, 1990 and annexed as Exhibit 1.46 to the Plan, the Litigation Trust was created for the benefit of certain of Resorts' creditors. Article II of the Litigation Trust Agreement separately defined the terms "Letter of Credit" and "Trust Assets." No mention of the Letter of Credit is made in the definition of "Trust Assets." Accordingly, this Court is compelled to conclude that the Letter of Credit was not a "Trust Asset." The Deposit Agreement, which permitted Resorts to substitute $5 million in cash in lieu of furnishing a $5 million letter of credit, in no way changed or modified the definition of "Trust Assets" to include the $5 million cash deposit. Consequently, this Court finds that the $5 million cash deposited in the Expense Account was also not intended to be a "Trust Asset" as of the date of the initial deposit.

In addition, the Litigation Trust did not have an unfettered right to draw upon those funds. Sections 7.10(a) and (d) of the Plan and Paragraph 3 of the Deposit Agreement all permit the Litigation Trustee to draw upon the balance of the $5 million deposit, if any, only upon settlement of the Litigation Claims.

In further support of its entitlement to the interest income, Resorts points to the prefatory statement to the Deposit Agreement, which provides in relevant part: "WHEREAS, the Trustee has agreed to *hold* the Deposit and make the required disbursements but only on the terms and conditions contained in this Agreement." (emphasis added). According to Black's Law Dictionary, the term "hold" has several meanings, including: "1. To possess in virtue of a lawful title, as in the expression, common in grants, 'to have and to hold'" and "9. To keep; to retain; to maintain possession of or authority over." Black's Law Dictionary 731 (6th ed. 1990). This Court is satisfied that the latter definition of "hold" is the definition most consistent with a straightforward reading of the prefatory statement and is, therefore, the definition intended by the parties herein. An interpretation of the prefatory statement which requires the Litigation Trust to hold (in an ownership sense) the funds, yet requires the Trustee to make certain disbursements therefrom is strained.

Finally, the terms of the Deposit Agreement also support this Court's determination that the Expense Account was not a "Trust Asset" as of the date of the initial deposit. Paragraph 1 of the Deposit Agreement requires that the Litigation Trustee furnish certain information to Resorts regarding the whereabouts of the $5 million, including the name and address of the depositary institution in which the Litigation Trustee deposited the $5 million, together with the account number(s) for those funds. This Court is satisfied that, absent an intent by the parties that Resorts retained an interest in those funds, the parties would not have agreed that the Litigation Trustee would be required to furnish, and Resorts would be entitled to receive, such information regarding the Expense Account.

The question thus becomes whether, despite the fact that the funds deposited in the Expense Account were not "Trust Assets" during the Pre–Settlement Period, interest earned on the Expense Account nevertheless

was a Litigation Trust asset. Logic dictates that the owner of the principal is also the owner of the interest earned thereon. This Court is compelled to agree.

This Court's determination that Resorts was entitled to interest income for the Pre–Settlement Period is in accordance with the bargain struck by the parties. This Court is satisfied that the parties intended that the Litigation Trust would eventually draw up to $5 million, that any interest earned on the initial $5 million deposit would be returned to Resorts, and that upon settlement, any post-settlement interest accrued on said funds would belong to the Litigation Trust.

The Litigation Trust mistakenly asserts that Sections 7.10(a) and (d) of the Plan and Article II of the Litigation Trust Agreement allocate the interest income, from the initial date of deposit, to the Litigation Trust and that, consequently, any subsequent transfer of the interest income to Resorts required, and lacked, consideration. This Court finds as a matter of law that the interest income belonged to Resorts during the Pre–Settlement Period. Thus, there was no subsequent agreement, for which consideration would be required, to transfer interest income to Resorts.

■ The Litigation Trust asserts that Paragraph 5 of the Deposit Agreement supports its position that interest income on the Expense Account belongs to the Litigation Trust. Paragraph 5 of the Deposit Agreement provides in relevant part:

> Except as set forth in Paragraph 1 herein, the Trustee shall have no duty to invest all or any portion of the Deposit during any period of time the Trustee may hold the same prior to disbursement thereof and any disbursements or deliveries of the balance of the Deposit required herein to be made by the Trustee shall be with such interest, if any, as shall have been earned thereon, unless provided otherwise herein or by the Agreement.

At first glance, Paragraph 5 appears to allocate interest to the Litigation Trust. However, where it appears that several instruments contain cross-references or there exists other evidence that they are function-ally interconnected, those instruments must be construed together as a single agreement. *See Kroblin Refrigerated Xpress, Inc. v. Pitterich,* 805 F.2d 96, 108 (3d Cir. 1986) (*citing Kingston Dodge, Inc. v. Chrysler Corp.,* 449 F.Supp. 52, 54 (M.D.Pa. 1978)); *In re Atlantic Computer Systems, Inc.,* 173 B.R. 844, 851–52 (S.D.N.Y.1994). Accordingly, this Court must construe Paragraph 5 of the Deposit Agreement in conjunction with Section 7.10(g) of the Plan and Article V, Section 5.6 of the Litigation Trust Agreement, which require the Litigation Trustee to invest funds held by the Trustee. Paragraph 7.10(g) of the Plan provides in relevant part:

> ... Funds held by the Litigation Trustee during the life of the Litigation Trust shall be invested by the Litigation Trustee as provided in the Litigation Trust Agreement, and the interest earned on such invested funds shall be distributed in the same manner as the proceeds of the Litigation Trust are distributed....

Article V, Section 5.6, of the Litigation Trust Agreement provides that "[t]he Trustee shall invest Trust Assets in its sole and absolute discretion...." Accordingly, pursuant to Section 7.10(g) of the Plan, interest earned on funds *invested* by the Litigation Trustee belongs to the Litigation Trust. When Paragraph 5 of the Deposit Agreement is construed together with Section 7.10(g) of the Plan and Article V, Section 5.6 of the Litigation Trust Agreement, it becomes apparent that the interest referred to in Paragraph 5 of the Deposit Agreement pertains only to funds actually invested by the Litigation Trustee, and not, as the Litigation Trust asserts, to all funds which accrue interest, such as the entire $5 million deposit.

Arguably, the result reached herein would follow even if this Court were to find that Paragraph 5 of the Deposit Agreement did not refer only to disbursements and distributions of funds invested by the Trustee, but rather to all disbursements and distributions of the entire balance of the $5 million deposit. The operative language of Paragraph 5 of the Deposit Agreement which purports to allocate accrued interest together with the principal is qualified by the phrase "unless

provided otherwise herein." Paragraph 3 of the Deposit Agreement arguably caps the Litigation Trust's entitlement to funds in the Expense Account at $5 million.

Unless and until the Letters of Credit are issued for the account of Resorts and for the benefit of the Trustee, the Trustee shall be entitled to apply the Deposit, *in amounts up to $5,000,000 in the aggregate of all funds so applied,* to pay or reimburse the Trustee for the payment of reasonable expenses of the Litigation Trust as and in the manner provided in Section 7.10(a) of the Plan, and *to apply the balance of such $5,000,000, if any,* upon final settlement of all Litigation Claims in the manner provided in Section 7.10(b) of the Plan.

Although not directly applicable, further support for this allocation of interest can be drawn from Paragraph 2 of the Deposit Agreement, which provides in relevant part:

2. If the requisite Letters of Credit are issued for the account of Resorts and for the benefit of the Trustee, and are delivered to the Trustee, the Trustee shall deliver the balance of the Deposit, *together with interest thereon,* to Resorts in accordance with instructions given by Resorts.

Paragraph 2 of the Deposit Agreement allocates the balance of the $5 million deposit, *together with interest,* back to Resorts in the event that Resorts subsequently posted a letter of credit. Although Resorts never posted a letter of credit, such an allocation lends support to this Court's determination that the parties intended that Resorts would be entitled to interest income from the Expense Account up to the date of settlement.

The Litigation Trust, in its own pleadings submitted to this Court, confirmed the parties' intent to allocate interest income during the Pre–Settlement Period to Resorts. Paragraph 15 of the Litigation Trust's February 7, 1994 Application for Interim Distribution provides in relevant part:

15. Finally, an order of this Court is appropriate to confirm the Trust and New Resorts' understanding that the interest earned on the Expense Account ... [is] not [an] asset[ ] of the Trust but rather belong[s] to and will be paid to New Resorts.

The Litigation Trust argues that the Interim Distribution Application is collateral, and thus not determinative, because (1) neither the Plan nor the Trust Agreement required the Court's approval before distribution of Litigation Trust assets, *see* the Interim Distribution Application, ¶ 11; and (2) no interest earned on the Expense Account funds was distributed in connection with that Interim Distribution Application. Stated another way, the Litigation Trust asserts that where an Application is not required by the Plan or the Bankruptcy Code to be filed in order to effectuate its purposes, the Court may not subsequently rely upon express representations made therein which clearly state the parties' intent as evidence of the parties' intent. This Court may take judicial notice of affirmative representations made by the Litigation Trustee in documents previously filed with this Court. *In re Jalufka,* 184 B.R. 562, 563 n. 1 (Bankr.E.D.Ark.1995); *In re Calder,* 907 F.2d 953, 955 n. 2 (10th Cir. 1990) (per curiam). Furthermore, the fact that no interest was actually distributed does not alter this Court's opinion that it was the parties' intent for Resorts to receive the interest income on the Expense Account during the Pre–Settlement Period.

The Litigation Trust asserts that the Litigation Trustee made a mistake when he represented in the Interim Distribution Application that Resorts was entitled to interest income from the Expense Account during the Pre–Settlement Period. The Successor Trustee asserts that he was also mistaken in his November 26, 1993 letter to the Majority Litigation Trust Unitholders Steering Committee when he simply repeated the Litigation Trustee's mistaken representation that pre-settlement interest belonged to Resorts. The Successor Trustee asserts that he would have corrected the mistake had he had access to the Foundation Documents. If the Litigation Trustee or the Successor Trustee had, in fact, made a mistake as to the ownership of the interest income, then the Litigation Trust arguably could obtain relief from this Court to reverse the mistake. Under New Jersey law,

[i]t is a general rule that a payment of money under a mistake of fact may be recovered, provided that such recovery will not prejudice the payee. This rule is grounded upon considerations of equity and fair dealing. It is considered unjust enrichment to permit a recipient to retain money paid because of a mistake, unless the circumstances are such that it would be inequitable to require its return.

*Winslow, Cohu & Stetson, Inc. v. Skowronek,* 136 N.J.Super. 97, 104, 344 A.2d 350 (Law Div.1975); *Great American Ins. Co. v. Yellen,* 58 N.J.Super. 240, 244, 156 A.2d 36 (App.Div.1959) ("[O]ne who has paid money under a mistake of fact but for which payment would not have been made may have restitution from the payee notwithstanding that the mistake was unilateral and a consequence of the payor's negligence, providing, however, that such restitution will not prejudice the payee."). In the present case, however, this Court finds that, pursuant to the Foundation Documents, the Litigation Trustee was not mistaken in allocating interest income from the Expense Account during the Pre–Settlement Period to Resorts and, even if the Successor Trustee did have access to the Foundation Documents, those documents support the Litigation Trustee's statement that the interest income earned during the Pre–Settlement Period belongs to Resorts.

Price Waterhouse twice confirmed the Litigation Trustee's representation regarding the allocation of interest income: once in its December 2, 1992 Report of Independent Accountants (Price Waterhouse) to the Trustee of Resorts' Litigation Trust (the "1992 Report"), and again in the Resorts Litigation Trust Statement of Cash Receipts and Disbursements For The Year Ending September 30, 1993 ("the Trust Statement") dated January 21, 1994. The 1992 Report provides in pertinent part:

Pursuant to the Settlement Agreement, the Trump Parties settled all of the Litigation Claims assigned to the Trust for $12 million. Furthermore, pursuant to Section 7.10(a) of the Plan, Resorts deposited $5 million in a separate expense account held on behalf of Resorts in order to secure Resorts' obligation to fund the Trust's expenses. Under this funding arrangement, *interest earned on the $5 million belongs to Resorts.* The balance of the funds remaining in the Expense Account, after the interest earned on the account is returned to Resorts and the expenses incurred by the Trust are paid in full, is available for distribution to Trust Unitholders pursuant to Section 7.10(d) of the Plan . . . .

The Trust Statement repeated this representation almost *verbatim.*

Finally, although not dispositive, the settlement reached between the IRS and the Litigation Trust is not inconsistent with this Court's allocation of interest income. The IRS and the Litigation Trust entered into a Stipulation and Order resolving trust fund tax liability for the years 1990 and 1991. The Stipulation and Order, which was approved by this Court on February 7, 1994, provided that the Litigation Trust would be treated as a grantor trust and accordingly, the balance remaining in, and interest earned in 1990 on, the Expense Account were deemed to be non-taxable to the Trust. The Litigation Trust agreed to pay the IRS $120,-000.00 in full satisfaction of the Litigation Trust and Unitholders' tax liability for the 1991 tax year. This treatment of tax liability is consistent with a finding that interest earned on the Expense Account during the Pre–Settlement Period belongs to Resorts, and that tax liability to the IRS for interest earned on those accounts resulted only from the $12 million settlement with the Trump Parties. This Court does not make such a holding, but rather outlines the relevant terms of the settlement and finds such terms consistent with the Court's holding herein.

Finally, the Successor Trustee asserts that Paragraph 2 of the agreement settling the Litigation Claims against Trump and the Trump Parties supports its argument that the interest income belonged to the Litigation Trust all along. Paragraph 2 of the Settlement Agreement provides in relevant part:

The Trustee, on behalf of the Litigation Trust, hereby . . . (c) agrees to pay to Resorts the amount of interest, if any, earned by the Trustee on the Litigation

Trust Fund from and after March 16, 1991 until the date hereof [May 28, 1991].[10]

The Litigation Trust asserts that, if Resorts was entitled to receive interest income during the entire Pre–Settlement Period, then Resorts and the Litigation Trustee would not need to enter into an agreement allocating a portion of such interest to Resorts. In the absence of other evidence indicating that Resorts is entitled to interest income from the Expense Account, this Court might be inclined to agree that evidence of an agreement between Resorts and the Litigation Trust to allocate interest from the Expense Account to Resorts suggests that the Litigation Trust owned and could allocate such interest. However, Sections 7.10(a) and (d) of the Plan and Paragraph 3 of the Deposit Agreement clearly allocate the pre-settlement interest income to Resorts, not to the Litigation Trust.

### CONCLUSION

Interest income earned on the Expense Account for the period beginning on or about October 3, 1990 through May 28, 1991 belongs to Resorts. Upon settlement of the Litigation Claims, the balance of the $5 million deposit became a "Trust Asset" as defined by Article II of the Litigation Trust Agreement, and any interest earned on such "Trust Asset" also became a "Trust Asset." Accordingly, the Litigation Trust is entitled to interest earned on the balance of the initial $5 million deposit for the period beginning May 28, 1991 through the present date. To the extent that the Settlement Agreement dated May 28, 1991 between the former Litigation Trustee Feinberg and Resorts provided for interest income earned on the Expense Account for the period March 16, 1991 through May 28, 1991 to be paid to Resorts, the Litigation Trust's entitlement to interest shall accrue from the post-settlement period following May 28, 1991.

10. According to the Successor Trustee, $57,-973.71 in interest accrued on the funds deposited in the Expense Account during the period between March 16, 1991 and May 28, 1991.